BASCHAB, Presiding Judge.
The appellant, Jeremy Bryan Jones, was convicted of four counts of capital murder for the killing of Lisa Nichols. The murder was made capital because he committed it during the course of a rape or an attempted rape, see § 13A-5-40(a)(3), Ala. Code 1975; a sexual abuse or an attempted sexual abuse, see § 13A-5-40(a)(8), Ala. Code 1975; a burglary, see § 13A-5-40(a)(4), Ala.Code 1975; and a kidnapping or an attempted kidnapping, see § 13A-5-40(a)(1), Ala.Code 1975. After a sentencing hearing, by a vote of 10-2, the jury recommended that he be sentenced to death. The trial court accepted the jury’s recommendation and sentenced him to death. The appellant filed a motion for a new trial, which was denied. This appeal followed.
The appellant raises some arguments on appeal that he did not raise at trial. Although the lack of an objection at trial will not bar our review of an issue in a case involving the death penalty, it will weigh against any claim of prejudice the appellant may raise. See Ex parte Kennedy, 472 So.2d 1106 (Ala.1985). Rule 45A, Ala. R.App. P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review ... whenever such error has or probably has adversely affected the substantial right of the appellant.”
“[This] plain-error exception to the contemporaneous-objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’ ” United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 n. 14 (1982)).
The appellant does not challenge the sufficiency of the evidence to support his convictions. However, we have reviewed the evidence, and we find that it is sufficient to support the appellant’s convictions. The following summary of the relevant facts, as prepared by the trial court, may be helpful to an understanding of this case:
“On Wednesday, September 15, 2004, the same day Hurricane Ivan struck in the Mobile area, Jeremy Jones arrived at the doorstep of Mark and Kim Bentley, a Turnerville couple. The Bentleys previously employed Jones in 1999-2000 and had provided housing for him. The Bentleys actually knew Jones as John Paul Chapman, an alias Jones had assumed during a previous visit to Ala *1263 bama. Continuing to hold himself out to be John Chapman, Jones informed the Bentleys that he needed work and a place to live. Accordingly, the couple allowed Jones to stay in their mobile home with their cousin, Scooter Coleman, while they fled the approaching hurricane with their children to relatives in Chickasaw, Alabama.
“Early the next morning, Thursday, while Hurricane Ivan was bearing down on Mobile, Jones contacted Kim Bentley through the use of two-way phones in an effort to locate a radio and batteries. Kim Bentley informed Jones that the items possibly could be found in her bedroom closet; however, she instructed Jones to tell Scooter Coleman, whom the family trusted, to search for the items in her closet. Instead, Jones personally scoured through Mrs. Bentley’s closet and found Mrs. Bentley’s .25 caliber handgun hidden under clothing and other items on the shelf.
“Later that Thursday afternoon, the Bentley family returned to their home in Turnerville. Throughout the day, Mark Bentley, Scooter Coleman, and Jones worked on damage caused by the storm in Bentley’s yard. It was during this time that the Bentleys’ neighbor, 43-year-old Lisa Marie Nichols, returned home after riding out the storm elsewhere. Jones inquired about Ms. Nichols to Mr. Bentley who informed Jones that she was a single female living alone in the mobile home next door.
“Throughout the early morning of Friday, September 17, 2004, until approximately 4:30 a.m., Jones and another neighbor, Chris Hill, consumed or ingested illegal narcotics. Around 5:00 a.m. the same morning, Lisa Nichols went to work at her job at a local grocery store. During the time Ms. Nichols was at work, Mark Bentley, Scooter Coleman, and Jones continued the cleanup work on Bentley’s yard. At some point that Friday, Jones requested Kim Bentley to purchase for him a six-pack of Bud Light beer. Mrs. Bentley left and returned with Jones’ six-pack of Bud Light, and then left the house with her children.
“That same day, Joel Taff Edge picked up Scooter Coleman from the Bentleys and they traveled to Edge’s home to clean up his storm damage. Coleman stayed with Edge throughout the entire day, leaving to return to the Bentleys’ home well after dark. When Ms. Nichols returned home from work, at approximately 5:00 p.m., Mark Bentley and Jones were at the Bentley residence.
“At approximately 6:00 p.m., Mark Bentley offered to buy hamburgers for Jones and himself. The closest restaurant open for business was a Hardee’s in Citronelle, which was approximately a 30-minute drive from the Bentley home. Furthermore, because the Hardee’s was the only restaurant open for business, Mr. Bentley stated he waited in line for hamburgers for approximately one hour once he arrived in Citronelle.
“Once Jones was left alone, he took Kim Bentley’s .25 caliber handgun and his Bud Light and went next door to the home of Lisa Nichols. Based on the evidence introduced at trial, Jones entered Ms. Nichols’ home, raped her under the threat of violence, and shot her three times in the head killing Ms. Nichols instantly.
“Jones, in an effort to cover up his crime, returned to the Bentleys’ residence where he obtained an undetermined amount of gasoline. Jones then returned to Ms. Nichols’ home covering her body and the bathroom in which she lay, with gasoline. Jones lit Ms. Nichols *1264 on fire, which caused a momentary explosion. This was heard by a neighbor, Ann Parden. Ms. Parden testified that she heard what appeared to be an explosion between 7:00 and 8:00 p.m. Jones then returned to the Bentleys.
“Sometime after 8:00 p.m., Joel Edge and Scooter Coleman finished their work on Mr. Edge’s property, and Edge brought Coleman back to the Bentley residence. Shortly thereafter, Mr. Bentley returned with the hamburgers, just as Jones was exiting the shower. After the three men went to bed at approximately 10:00 p.m., Mark Bentley, through his open bedroom window, heard a noise and smelled the odor of gasoline. Bentley, after investigating, saw Jones just outside Bentley’s bedroom window where he kept several gasoline cans. When confronted by Mr. Bentley, Jones claimed that he was putting gasoline in Bentley’s four-wheelers so that he could take a late night ride. Bentley instructed Jones to return into the house and to go to bed.
“Saturday morning, September 18, 2004, Lisa Nichols did not show up to work, nor did she return any phone calls from her family. Late that Saturday evening, Ms. Nichols’ two daughters, Jennifer Murphy and Amber Nichols, and Ms. Nichols’ son-in-law, Todd McKerchie, drove to check on Ms. Nichols at her home in Turnerville. After arriving at Ms. Nichols’ home shortly before midnight, they were surprised to find her back door ajar. Using only flashlights (due to a lack of electricity from the hurricane), Lisa Nichols’ family went directly to her bedroom. McKer-chie looked into the bathroom and found the charred remains of Ms. Nichols’ body lying on the bathroom floor.
“Ms. Nichols’ daughters and son-in-law ran from Ms. Nichols’ home hysterical and screaming for assistance. They went to Mark Bentley’s home where Mark Bentley and Scooter Coleman immediately ran to Ms. Nichols’ home in a panicked attempt to help Ms. Nichols. Jones stayed behind, showing little or no emotion or willingness to help. The group quickly discovered that no amount of help could save Ms. Nichols. 911 had been contacted and deputies from the Mobile County Sheriffs Department arrived shortly thereafter.
“Upon Jones learning from Mark Bentley early that Sunday morning that Ms. Nichols’ body had been discovered severely burned, but not completely destroyed, Jones told Mark Bentley that he had been informed by his uncle (a Vietnam veteran) that to completely dispose of a dead body during the war soldiers simply doused the body in gasoline and lit it on fire. Hours later that Sunday, and after having acted strangely around the Bentley family throughout the morning, Jones departed the Bentley house never to return.
“The preliminary autopsy of Ms. Nichols allowed the detectives to quickly learn that her cause of death was three gunshot wounds to her head. After the Sheriffs detectives learned of Jones’ presence at the Bentleys’ home and his suspicious actions surrounding the time of the murder, they attempted to locate Jones for questioning. Jones was discovered and arrested on Tuesday morning, two days after he vanished from the Bentley home. When the deputies informed Jones of his arrest, Jones stated, T had every intention of making you kill me.’
[[Image here]]
“The court will not list all of the evidence linking Jones to Ms. Nichols’ murder. This was a week-long trial with well over 100 items introduced into evi *1265 dence. Instead, this Court will outline some of the most critical evidence.
“The most convincing evidence of Jones’ guilt was his multiple confessions to the rape and murder of Lisa Nichols. Beginning on the day he was arrested, and continuing for several months, Jones made several statements to Mobile County Sheriffs deputies that he committed the murder. Although Jones initially denied even being present at Ms. Nichols’ home, as the evidence of his guilt mounted, Jones began detailing his actions to the deputies. This occurred over several interviews. Ultimately, Jones confessed to entering Lisa Nichols’ home, raping her, shooting her in the head three times with Kim Bentley’s pistol, and burning Ms. Nichols’ body to cover his crime. The evidence from the scene of the crime corroborates Jones’ confessions....
“Jones also confessed on at least two other occasions, in addition to his taped confessions to the deputies. Gary Car-tee, the local fire marshal, testified that Jones informed him that he could not ‘rewind’ Ms. Nichols’ murder and he ‘put a light to it and burned it all away.’ Even more telling, however, was a voluntary phone call Jones made to his friend, Mark Bentley, while incarcerated. Mr. Bentley confronted Jones with the reality of his actions and Jones confessed to Bentley that he had killed Ms. Nichols while high on methamphet-amines....
“Scott Milroy, a toolmarks expert from the Alabama Department of Forensic Sciences, testified that the bullets recovered from Lisa Nichols’ head and bathroom floor matched the .25 caliber handgun Jones admitted taking from Mrs. Bentley’s closet. Moreover, Donna Gibbons, a DNA expert from the Alabama Department of Forensic Sciences, testified that a fluid stain tested from Jones’ shirt was consistent with the Defendant’s DNA and the victim’s DNA. This direct physical evidence presented by the State corroborated Jones’ statement and further proved his guilt.
“Additionally, several pieces of circumstantial evidence corroborated Jones’ confessions of guilt. The fact that several cans of Bud Light were found at Ms. Nichols’ home and that Jones had bought gasoline from at least two other neighbors, Dan Vanderlay and Bob Copeland, shortly before the murder, corroborated Jones’ various statements.”
(C.R. 422-29.)
I.
The appellant’s first argument is that the trial court erred in denying his motion for a change of venue.
“ ‘A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court’s ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion. Nelson v. State, 440 So.2d 1130 (Ala.Cr.App.1983).’
“Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App.1994).”
Clemons v. State, 720 So.2d 961, 977 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998). “The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather, Ex parte Grayson [, 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or *1266 that the community was saturated with prejudicial publicity.” Slagle v. State, 606 So.2d 193, 195 (Ala.Crim.App.1992). “ ‘Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial.’ ” Whisenhant v. State, 555 So.2d 219, 224 (Ala.Crim.App.1988), aff'd, 555 So.2d 235 (Ala.1989) (quoting Dannelly v. State, 47 Ala.App. 363, 364, 254 So.2d 434, 435 (Ala.Crim.App.1971)).
“In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated ‘actual prejudice’ against him on the part of the jurors; 2) when there is ‘presumed prejudice’ resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) ]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th. Cir.1983).”
Hunt v. State, 642 So.2d 999, 1042-43 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).
A.
We must first determine whether the pretrial publicity resulted in “presumptive prejudice.” For prejudice to be presumed under this standard, the defendant must show: 1) that the pretrial publicity was prejudicial and inflammatory and 2) that the prejudicial pretrial publicity saturated the community where the trial was held. See Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985). Under this standard, a defendant carries an extremely heavy burden of proof.
“Hunt relies on the ‘presumed prejudice’ standard announced in Rideau, and applied by the United States Supreme Court in Estes and Sheppard [v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) ]. This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: ‘Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.’ 778 F.2d at 1490 (emphasis added [in Hunt ]). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
“In determining whether the ‘presumed prejudice’ standard exists the trial court should look at ‘the totality of the surrounding facts.’ Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is ‘rarely’ applicable, and is reserved for only ‘extreme situations’. Coleman v. Kemp, 778 F.2d at 1537. ‘In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice.’ Coleman v. Kemp, 778 F.2d at 1490.
“Hunt had the burden of showing that ‘prejudicial pretrial publicity’ saturated the community. Sheppard, supra. ‘[T]he burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one.’ Coleman v. Kemp, 778 F.2d at *1267 1537. ‘Prejudicial’ publicity usually must consist of much more than stating the charge, and of reportage of the pretrial and trial processes. ‘Publicity and ‘prejudice’ are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial.
[[Image here]]
“... In order to meet the burden of showing the necessity for a change of venue due to pretrial publicity on the grounds of community saturation, ‘the appellant must show more than the fact “that a case generates even widespread publicity.” ’ Oryang v. State, 642 So.2d 979, 983 (Ala.Cr.App.1993), quoting, Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert. denied, [502] U.S. [1030], 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
“ ‘ “Newspaper articles alone would not necessitate a change in venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accu-sational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945].” ’
“Thompson, 581 So.2d at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala.Cr.App.), cert. denied, 353 So.2d 35 (Ala.1977).
“A review of the media coverage contained in the record on appeal demonstrates that the majority of print media coverage was reasonably factual and more or less objective. We find that the reportage by the news media did not result in the community being so ‘pervasively saturated’ with prejudicial publicity so as to make the court proceedings nothing more than a ‘hollow formality.’ Rideau, supra.”
Hunt, 642 So.2d at 1043-44. “To justify a presumption of prejudice under this standard, the publicity must be both extensive and sensational in nature. If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice.” United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir.1990).
In support of his motion for a change of venue, the appellant introduced evidence concerning a telephone poll of 405 Mobile County citizens about the case. When asked how closely they followed the case, 7 percent said very closely, 40 percent said somewhat closely, 25 percent said not very closely, 26 percent said not closely at all, and 2 percent said they did not know or the question was not applicable. When asked whether they believed the appellant was guilty or innocent, 62 percent indicated that they did not have an opinion, 32 percent said he was guilty, 5 percent did not answer or refused to answer, and 1 percent said he was innocent.[1] When asked about whether they knew if the appellant had been charged in any other cases, 35 percent indicated that he had, 24 percent said that he had not, and 41 percent did not know. When asked if they could set aside what they knew about the case if they were chosen for jury service, 67 percent indicated that it would not be difficult, 22 percent indicated that it would be difficult, 7 percent indicated that it would be impossible, and 4 percent did not *1268 answer or indicated that they did not know. The appellant also introduced numerous newspaper articles from local newspapers and portions of newscasts by local television stations covering the case from its inception through the trial, including information as to the area covered by the media.
We have carefully examined the media materials the appellant presented to the trial court. Although some of the materials referenced the fact that he was a suspect in or charged with other similar offenses in other jurisdictions and might be a serial killer, we find that most of the reports were factual and relatively objective rather than accusatory, inflammatory, or sensational. Therefore, we conclude that the materials did not contain prejudicial information. See People v. Townes, 130 Ill.App.3d 844, 854, 86 Ill.Dec. 137, 474 N.E.2d 1334, 1341 (1985) (noting that “[t]he mere fact that pretrial publicity includes references to a defendant’s past crimes is not sufficient to presume bias on the part of prospective jurors”). Further, the appellant did not prove that the media attention inflamed or saturated the community so that there was an emotional tide against him. Thus, he has not shown that the pretrial publicity in this case was so inherently or presumptively prejudicial as to constitute one of those “extreme situations” that warrant a presumption of prejudice from pretrial publicity.
B.
We must also determine whether the jury was actually prejudiced against the appellant.
“The ‘actual prejudice’ standard is defined as follows:
“ ‘To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin v. Dowd, 366 U.S. [717,] 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961) ]. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and “rendered] a verdict based on the evidence presented in court.” Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643 [6 L.Ed.2d at 756].’
“Coleman v. Zant, 708 F.2d at 544.”
Hunt, 642 So.2d at 1043.
“Furthermore, in order for a defendant to show prejudice, the ‘ “proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.” Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978).’ Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985).”
Oryang v. State, 642 So.2d 979, 983 (Ala.Crim.App.1993).
The appellant has not shown that any pretrial publicity actually prejudiced him. During the voir dire proceedings, the parties individually questioned each venire-member and extensively covered exposure to the media and/or knowledge about the case. Many of the veniremembers had heard, read, or seen or knew something about the case. However, very few indicated that they had already formed opinions about the case based on that information and that they could not be fair, and the trial court excused those venire-members for cause. The remaining veniremembers indicated that they could set aside any information they had previously obtained about the case and make a decision based solely on the evidence presented during the trial. Accordingly, the appellant has not shown that any of the *1269 jurors were actually prejudiced against him.
For these reasons, the appellant did not show that the jurors were either presumptively or actually prejudiced against him. Therefore, the trial court did not abuse its discretion in denying the appellant’s motion for a change of venue.
II.
The appellant’s second argument is that the trial court erroneously admitted the statements he made to law enforcement officers.
“It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, ‘if his will has been overborne’ by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
“The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the ‘totality of the circumstances.’ Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant’s will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant’s will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is ‘whether the defendant’s will was overborne at the time he confessed’) (emphasis added). Thus, to determine whether McLeod’s confession was improperly induced, we must determine if his will was ‘overborne’ by an implied promise of leniency.
[[Image here]]
“... Thus, the test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant’s will was overborne by ‘apprehension of harm or hope of favor.’ See Gaddy, 698 So.2d at 1154 (quoting Ex parte Weeks, 531 So.2d 643, 644 (Ala.1988)); Culombe, 367 U.S. at 602, 81 S.Ct. at 1879; Jackson, 562 So.2d at 1380. To determine if a defendant’s will has been overborne, we must assess ‘the conduct of the law enforcement officials in creating pressure and the suspect’s capacity to resist that pressure’; ‘[t]he defendant’s personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant’s] susceptibility to police pressures.’ *1270 Jackson, 562 So.2d at 1380-81 (citations omitted).”
McLeod v. State, 718 So.2d 727, 729-30 (Ala.1998) (footnote omitted). Also,
“ ‘[conflicting evidence given at [a] suppression hearing presents a credibility choice for the trial court.’ Atwell v. State, 594 So.2d 202, 212 (Ala.Cr.App.1991), cert. denied, 594 So.2d 214 (Ala.1992). ‘[A] trial court’s ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, and is not to be reversed absent a clear abuse of discretion.’ Jackson v. State, 589 So.2d 781, 784 (Ala.Cr.App.1991) (citations omitted).”
Rutledge v. State, 651 So.2d 1141, 1144-45 (Ala.Crim.App.1994).
During the suppression hearing, Investigator Paul Burch of the Mobile County Sheriffs Department testified that he spoke to the appellant thirty or forty times and elicited statements about the murder of the victim three or four times. He testified that, on September 21, 2004, the appellant made his first statement; that he asked the appellant if he was under the influence of drugs or alcohol, and the appellant said that he last used methamphet-amines approximately two days before; that the appellant was coherent and articulate and did not appear to be under the influence of drugs or alcohol; that he advised the appellant of his Miranda rights, and he appeared to understand them and waived them; that he did not threaten or coerce the appellant at any time; and that he did not tell the appellant it would be better for him if he made a statement or worse for him if he did not.
On cross-examination regarding the appellant’s first statement, Burch admitted that the appellant went to the bathroom by himself; that the appellant made reference to bringing him back in a few days when he was off of the drugs; and that metham-phetamines were found on the appellant when he was taken to the jail after he made the statement. However, he testified that the appellant’s demeanor did not change at any time during the interview and that he did not appear to be under the influence of methamphetamines during the interview. Burch also admitted that the appellant indicated at some point that he had been awake for an extended period of time, but he did not remember how long. He further admitted that they gave the appellant food and drinks and that, at one point, the appellant told them he was not going to argue with them and that he would agree to it if they wrote it out.
In his first statement, the appellant said that, on the day the victim died, she consumed methamphetamines; that he and the victim had consensual sexual intercourse; that the victim started complaining about chest pains and had convulsions; and that the victim died while she was in the bathroom of her home. He also said that he got a gun from the Bentleys’ mobile home, shot the victim two or three times, and later set a fire in the bathroom of the victim’s mobile home.
Burch testified that, on November 4, 2004, the appellant made his second statement; that he advised the appellant of his Miranda rights, and he appeared to understand them and waived them; that the appellant did not appear to be under the influence of any intoxicating substance; that he did not threaten or coerce the appellant at any time; and that he did not tell the appellant it would be better for him if he made a statement or worse for him if he did not.
Burch testified that, on January 25, 2005, the appellant made his third statement; that he advised the appellant of his Miranda rights, and he appeared to understand them and waived them; that the *1271 appellant did not appear to be under the influence of any intoxicating substance; that he did not threaten or coerce the appellant at any time; and that he did not tell the appellant it would be better for him if he made a statement or worse for him if he did not.
Burch testified that, on February 9, 2005, the appellant made his fourth statement; that he advised the appellant of his Miranda rights, and he appeared to understand them and waived them; that the appellant did not appear to be under the influence of any intoxicating substance; that he did not threaten or coerce the appellant at any time; and that he did not tell the appellant it would be better for him if he made a statement or worse for him if he did not.
On cross-examination about the appellant’s remaining statements, Burch admitted that the appellant ate the same thing law enforcement personnel ate if he was away from the jail during mealtimes, that they also sometimes gave him snacks, that they allowed him to make telephone calls to friends and family, that the appellant cried about a dozen times and tried to hug him one time, and that the appellant once made the statement that the only reason he talked to them was to get something to eat.
In his second statement, the appellant said that he used a lot of crystal metham-phetamines; that he went to the victim’s mobile home; that he tried to force the victim to have sexual intercourse with him, but could not go through with it; that he threw a towel over the victim’s head and shot her three times; and that he later returned and set the victim’s mobile home on fire. In his third statement, the appellant admitted that he raped the victim, but said that he did not want to talk about it. In his fourth statement, the appellant admitted that he raped the victim, shot her in the head two or three times, and poured gasoline on her body and set it on fire.
During the suppression hearing, the defense presented the following:
Dr. Charles E. Smith, a psychiatrist who treated patients at the Mobile Metro Jail, testified that he prescribed antidepressants for the appellant in May 2005; that, when jail personnel had concerns that the appellant might be suicidal, they placed him in the suicide wedge; and that the records did not show that he ordered that the appellant be placed in the suicide wedge, but did show that he ordered that the appellant be removed from the suicide wedge. He also testified that the appellant apparently received the antipsychotic drug Risperdal for a time in late 2004; that the drug calms the patient and helps bring his thinking under control; that he did not prescribe the drug for the appellant; that he treated the appellant during the time he would have taken the drug, and the appellant was able to communicate with him and did not act abnormally; that the appellant refused to take his medications on several occasions; and that he ordered that the drug be stopped in late November 2004. Smith further testified that he did not know whether the appellant had taken the drug; that inmates commonly accept their medications and do not take them; that inmates commonly use such medications to barter or attempt suicide; and that jail personnel found a hoard of medication in the appellant’s cell in May 2005. Finally, he testified that he worked for a private contractor and made medical decisions independently of the sheriffs personnel.
Anna Christine Eaton testified that she was a psychiatric nurse who worked with inmates at the Mobile Metro Jail; that she had contact with the appellant at the jail; that it appeared that the appellant had received Risperdal in error in November *1272 2004; and that the appellant had been placed in the suicide wedge at least two times because of his behavior while incarcerated.
Dr. Steve Bethea, an expert in pharmacology, testified that Risperdal is an anti-psychotic medication that is used to treat patients who have been diagnosed with schizophrenia or bipolar disorders; that the drug can slow the brain functioning and can affect a person’s ability to make a reasoned decision; and that he was not aware of any instance in which the dosage the appellant was receiving had caused a person to lose touch with reality.
Dr. Daniel L. Koch, an expert in clinical psychology, testified that, if Risperdal is taken by a person who is not schizophrenic or bipolar, it could possibly disrupt cognitive abilities. He also testified that Ris-perdal is a safe drug that can be given in up to four times the dosage the appellant received with relatively minor side effects. Finally, he testified that the appellant said that if he talked to the officers and told them what they wanted to talk about, he got to use the telephone; that the appellant had indicated that, at some point, he decided he would tell the officers anything they wanted to talk about to get out of confinement; and that the situation with the officers controlling food, surroundings, and access to family could be coercive.
A.
The appellant contends that he did not voluntarily make his first statement because he had been awake for an extended period of time and because he had used methamphetamines previously. Even assuming that he had not had much sleep before he made the statement, the appellant responded appropriately, appeared to be quite lucid, and gave a very detailed description of what he contended happened with the victim. “[Wjhether a defendant was physically exhausted when he gave his statement is merely one factor to be considered by the jury in determining the credibility and weight to afford the statement.” Powell v. State, 796 So.2d 404, 416 (Ala.Crim.App.1999), aff'd, 796 So.2d 434 (Ala.2001).
Also, the Legislature has defined “intoxication” to include “a disturbance of mental or physical capacities resulting from the introduction of any substance into the body.” § 13A-3-2(e)(1), Ala.Code 1975.
“In order for intoxication to render a confession inadmissible, it must be shown that the mind of the defendant was substantially impaired when the confession was made. Moore v. State, 488 So.2d 27 (Ala.Cr.App.1986); Moore v. State, 415 So.2d 1210 (Ala.Cr.App.), cert. denied, 415 So.2d 1210 (Ala.), cert. denied, 495 U.S. 1041, 103 S.Ct. 459, 74 L.Ed.2d 610 (1982), and cases cited therein. ‘Intoxication, short of mania or such impairment of the will and mind as to make an individual unconscious of the meaning of his words, will not render a statement or confession inadmissible.’ Tice v. State, 386 So.2d 1180, 1185 (Ala.Cr.App.), cert. denied, 386 So.2d 1187 (Ala.1980). See also Palmer v. State, 401 So.2d 266, 268 (Ala.Cr.App.), cert. denied, 401 So.2d 270 (Ala.1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982).
“The voluntariness of an alleged confession is a question of law addressed to the trial court, whose ruling will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. Tice v. State, supra; Garrison v. State, 372 So.2d 55 (Ala.Cr.App.1979). The degree of intoxication which would affect the voluntariness of a statement is a question of fact initially addressed to the *1273 trial court and, depending upon its ruling, then to the jury for its consideration. Tice v. State, 386 So.2d at 1185.”
Hubbard v. State, 500 So.2d 1204, 1218 (Ala.Crim.App.), aff'd, 500 So.2d 1231 (Ala.1986).
Although the appellant stated that he had used methamphetamines before he was arrested, the evidence does not indicate that, when he made his statement, his mind and will were substantially impaired and he could not understand the meaning of his words. In fact, our review of the tapes of the first statement indicates that he understood what was happening, was coherent, and gave a very detailed description of what he contended happened with the victim.
“There is no indication in the record that the appellant was intoxicated to the extent that he could not comprehend the meaning of his words. Therefore, the appellant’s drug use was a circumstance to be considered by the jury, rather than a factor which would affect the admissibility of his statement.”
Harris v. State, 580 So.2d 33, 36 (Ala.Crim.App.1990).
For these reasons, the trial court did not err in admitting the appellant’s first statement into evidence.
B.
The appellant contends that he did not voluntarily make his second, third, and fourth statements because law enforcement officers gave him food that was better than jail food and allowed him to make telephone calls when they interrogated him. Specifically, he asserts that
“[tjhe fact that the Defendant had to go to the detectives to make contact with his family, get out of jail, or get better food, would make the detectives the controller of his resources and someone the Defendant would want to please.”
(Appellant’s brief at p. 77.)
“[Tjhe other factors raised by the appellant, including his ... vulnerability, while considerations under the totality of the circumstances concerning voluntariness, are not in and of themselves determinative.
“ ‘In Elrod v. State, 281 Ala. 331, 334, 202 So.2d 539, 542 (1967), this Court stated:
“ ‘ “Accused’s intelligence, character and situation at the time of the confession of the crime charged are important considerations in determining whether the confession was voluntary, but the fact that accused was of tender age or weak intellect will not alone render the confession inadmissible in evidence as involuntary. State v. Ashdown, 5 Utah 2d 59, 296 P.2d 726 [1956], affirmed, 357 U.S. 426, 78 S.Ct. 1354, 2 L.Ed.2d 1443 [1958].” ’
“Ex parte Brown, 540 So.2d 740, 744 (Ala.1989). See also Jackson v. State, 549 So.2d 616 (Ala.Cr.App.1989) (this Court found that, although the appellant contended that his statement was involuntary because he was only 19 years of age, was in the twelfth grade, was interrogated for a long period, and was extremely nervous, the totality of the circumstances indicated that the appellant understood his constitutional rights and that his confession was voluntary).”
McWhorter v. State, 781 So.2d 257, 285 (Ala.Crim.App.1999), aff'd, 781 So.2d 330 (Ala.2000).
The appellant also contends that he was being treated with antidepressants; that he was placed on and removed from suicide watch several times; and that he received Risperdal for a period of time, even though the jail psychiatrist had not *1274 prescribed it for him. Any ingestion of antidepressants and Risperdal and any placement on and removal from suicide watch went to the weight the jury would assign his statements rather than their admissibility. See Harris, supra; McWhorter, supra.
We have reviewed the transcripts and the recordings of the appellant’s statements. In reviewing the record and the appellant’s statements, we have taken into account the factors set forth herein. However, the totality of the circumstances indicates that the appellant understood his constitutional rights and that he voluntarily made his second, third, and fourth statements. Therefore, the trial court did not err in admitting those statements into evidence.
III.
The appellant’s third argument is that the trial court erred in admitting the testimony of Gary Cartee, a deputy state fire marshal.[2] Relying on the Alabama Supreme Court’s decision in Board of Water & Sewer Commissioners of Mobile v. Hunter, 956 So.2d 403 (Ala.2006), he specifically contends that Cartee gave “testimony concerning the application of special knowledge of ‘mathematical, physical and engineering sciences’ that such testimony constituted the “practice of engineering”; and that “such testimony is not to be allowed without the witness first having the proper license.” (Appellant’s brief at p. 84.) Because he raises this argument for the first time on appeal, we review it for plain error. See Rule 45A, Ala. R.App. P.
In Hunter, the Alabama Supreme Court noted that, in 1997, the Alabama Legislature amended § 34-11-1(7), Ala.Code 1975, to expand the definition of the “practice of engineering” to include any “testimony” related to that profession. Section 34-11-1(7), Ala.Code 1975, as amended effective August 1, 1997, defines the “practice of engineering” as follows:
“Any professional service or creative work, the adequate performance of which requires engineering education, training, and experience in the application of special knowledge of the mathematical, physical, and engineering sciences to such services or creative work as consultation, testimony, investigation, evaluation, planning, design and design coordination of engineering works and systems, planning the use of land and water, performing engineering surveys and studies, and the review of construction or other design products for the purpose of monitoring compliance with drawings and specifications; any of which embraces such services or work, either public or private, in connection with any utilities, structures, buildings, machines, equipment, processes, work systems, projects, and industrial or consumer products; equipment of a control, communications, computer, mechanical, electrical, hydraulic, pneumatic, or thermal nature, insofar as they involve safeguarding life, health, or property; and including other professional services necessary to the planning, progress, and completion of any engineering services.”
(Emphasis added.) Also, § 34-ll-2(a), Ala.Code 1975, provides: “No person in either public or private capacity shall practice or offer to practice engineering ..., unless he or she shall first have submitted evidence that he or she is qualified so to practice and shall be licensed by the board *1275 as hereinafter provided .... ” Finally, § 34-11-15, Ala.Code 1975, provides: “Any person who shall practice, offer to practice, or hold himself or herself out as qualified to practice engineering ..., without being licensed or exempted in accordance with this chapter, ... shall be guilty of a Class A misdemeanor and punished as provided by law.”
In Hunter, the Alabama Supreme Court explained: “[T]he language of the amendment was confined to the subject of engineering. That amendment does not purport to require a license for anything other than the practice of engineering .... ” 956 So.2d at 416. It also noted:
“[I]f a person has any uncertainty as to whether his or her proposed testimony falls within the meaning of the ‘practice of engineering/ the Licensure Act allows him or her to obtain an advisory opinion from the Licensure Board as to whether the statute has or will be triggered. See Regulation 330-X-1-.12, Ala. Ad-mimCode (Ala. State Board of Registration for Professional Engineers and Land Surveyors). Thus, a person wanting to testify to engineering matters within this State need not wait until after the testimony to determine whether it runs afoul of the Licensure Act.”
956 So.2d at 420.
On August 28, 2006, the State Board of Licensure for Professional Engineers and Land Surveyors (“the Board”) issued an advisory opinion that stated, in relevant part:
“The State Board of Licensure for Professional Engineers and' Land Surveyors met at a special called meeting on August 28, 2006. The meeting addressed the recent Alabama Supreme Court opinion in Board of Water and Sewer Commissioners of the City of Mobile v. Hunter .... In an effort to give guidance to the Courts of Alabama, the Office of the Attorney General, the Alabama Department of Public Safety, the State Fire Marshal’s Office, and attorneys handling cases in the state of Alabama, the Board issues the following advisory opinion:
[[Image here]]
“The definition of the practice of engineering ... first limits what is to be considered as the practice of engineering to those areas that ‘... [require] engineering education, training, and experience....’ Ala.Code §34-11-1(7) (2002).... [TJhere are areas of specialization that may be adequately performed by persons that are not educated, trained or experienced in the engineering field, or licensed to practice engineering in Alabama.... [T]he Board is of the opinion that the areas of ballistics, crime scene analysis, blood spatter analysis, vehicular accident investigation, human factors, biomedical/biomechanics and fire investigation clearly do not require engineering education, training, and experience to be adequately performed, and the Board does not identify these areas as ‘engineering’ within the definition given by the Alabama Legislature unless the proposed expert is claiming to base his or her analysis strictly on their engineering education and engineering experience.
“Additionally, the definition of the practice of engineering ... further limits testimony and other acts considered to be the practice of engineering to those acts done ‘... in connection with any utilities, structures, buildings, machines, equipment, processes, work systems, projects, and industrial or consumer products ... ’ Under the given definitions, the Board is of the opinion that the areas of fire analysis, analysis of chemical structures and composition, *1276 do not necessarily require an engineering background to perform and are not usually done ‘in connection with any utilities, structures, buildings, machines, equipment, processes, work systems, projects, and industrial or consumer products’, and the Board does not identify these areas as ‘engineering1 within the definition given by the Alabama Legislature.”
(Emphasis added.) “[A]n administrative agency’s interpretation of a statute it is charged with administering should be given great weight and deference.” Patterson v. Emerald Mountain Expressway Bridge, L.L.C., 856 So.2d 826, 833 (Ala.Civ.App.2002). “Although ... the agency’s interpretation is not binding on this Court, see Sand Mountain Bank v. Albertville Nat’l Bank, 442 So.2d 13 (Ala.1983), we consider it especially persuasive.” Farmer v. Hypo Holdings, Inc., 675 So.2d 387, 391 (Ala.1996).
In this case, Cartee testified that he investigated the fire, that the victim’s body was set on fire and was the point of origin of the fire, and that gasoline was used as an accelerant. In its advisory opinion, the Board specifically stated that fire investigation did not constitute engineering unless the expert claimed to base his analysis on his engineering education and engineering experience. Cartee did not in any way claim that he based his analysis on an engineering education or engineering experience. In light of the Board’s advisory opinion, we conclude that Cartee’s testimony did not require “engineering education, training, or experience in the application of special knowledge of the mathematical, physical, and engineering sciences”; that his testimony did not constitute the “practice of engineering”; and that he was not required to be licensed as an engineer to testify. Therefore, there was not any error, much less plain error, in this regard.
IV.
The appellant’s fourth argument is that
“[t]he failure, in capital cases, of the State of Alabama to provide for representation in the manner set out in the American Bar Association (“ABA”) Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases constitutes a denial of [his] rights to counsel as envisioned in the Sixth Amendment to the United States Constitution and Due Process of Law as envisioned in the Fifth and Fourteenth Amendments to the United States Constitution.”
(Appellant’s brief at p. 85.) In essence, he appears to contend that his attorneys rendered ineffective assistance simply because Alabama has not adopted the guidelines set out by the ABA.
Initially, we note that the appellant has not attempted to set forth any specific facts to establish that his rights to counsel and due process have been adversely affected because Alabama has not adopted the ABA guidelines. Instead, he has made bare, speculative allegations about how a defendant’s rights might be adversely affected without adherence to the ABA guidelines.
Moreover, in Strickland v. Washington, 466 U.S. 668, 687-89, 104 S.Ct. 2052, 2064-65, 80 L.Ed.2d 674 (1984), the United States Supreme Court held:
“A convicted defendant’s claim that counsel’s assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that *1277 the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
“As all the Federal Courts of Appeals have now held, the proper standard for attorney performance is that of reasonably effective assistance....
“More specific guidelines are not appropriate. The Sixth Amendment refers simply to ‘counsel,’ not specifying particular requirements of effective assistance. It relies instead on the legal profession’s maintenance of standards sufficient to justify the law’s presumption that counsel will fulfill the role in the adversary process that the Amendment envisions. See Michel v. Louisiana, 350 U.S. 91, 100-101, 76 S.Ct. 158, 163-164, 100 L.Ed. 83 (1955). The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.
[[Image here]]
“... In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel’s assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed.1980) (‘The Defense Function’), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel’s conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. See United States v. Decoster, 199 U.SApp. D.C., at 371, 624 F.2d, at 208. Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant’s cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.”
In Roe v. Flores-Ortega, 528 U.S. 470, 479, 120 S.Ct. 1029, 1036, 145 L.Ed.2d 985 (2000), the United States Supreme Court reiterated:
“‘[Pjrevailing norms of practice as reflected in American Bar Association standards and the like ... are only guides,’ and imposing ‘specific guidelines’ on counsel is ‘not appropriate.’ Strickland, 466 U.S., at 688, 104 S.Ct. 2052. And, while States are free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented, we have held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices.”
Also, in subsequent decisions, the United States Supreme Court has continued to refer to the ABA standards as guides for determining what is reasonable. See Rompilla v. Beard, 545 U.S. 374, 387, 125 S.Ct. 2456, 2466, 162 L.Ed.2d 360 (2005); Wiggins v. Smith, 539 U.S. 510, 524, 123 S.Ct. 2527, 2537, 156 L.Ed.2d 471 (2003). Finally, in Torres v. State, 120 P.3d 1184, 1189 (Okla.Crim.App.2005), the Oklahoma *1278 Court of Criminal Appeals addressed a similar situation as follows:
“Torres correctly notes that customs of practice for capital defense attorneys have evolved since his trial. During testimony and argument, Torres relied on the American Bar Association guidelines for minimum standards of counsel in capital cases, arguing that trial counsel’s performance as described above failed to meet those standards. As early as 1984, the United States Supreme Court recognized the ABA Standards for Criminal Justice for defense counsel, noting that these are only guidelines and declining to adopt them as a set of formal rules of representation. We also recognize the utility of guidelines for effective capital counsel. However, we will not find that capital counsel was per se ineffective simply because simply counsel’s representation differed from current capital practice customs, even where the differences are significant. A defendant must still show that he was prejudiced by counsel’s representation.”
(Footnotes omitted.)
We decline to find that counsel is per se ineffective simply because Alabama has not adopted the ABA guidelines. Although the ABA guidelines may, in some instances, provide guidance as to what is reasonable in terms of counsel’s representation, they are not determinative. Rather, the two-pronged analysis set forth in Strickland remains the standard for deciding ineffective-assistance-of-counsel claims. Such a standard is sufficient to protect a defendant’s rights to both counsel and due process.
For these reasons, the appellant is not entitled to relief as to this argument.
V.
The appellant’s fifth argument is that the trial court erred in granting the State’s motion for a mental evaluation before he entered a plea of not guilty by reason of mental disease or defect. Specifically, he contends that, “[without the issue of sanity being raised, the State is not allowed to have the accused tested or evaluated, nor can the State access any records of psychotherapy.” (Appellant’s brief at p. 106.)
With regard to mental examinations, Rule 11.2(a), Ala. R.Crim. P., provides:
“(1) Competency to Stand Trial. When a person charged with a crime is before a circuit court, the defendant, the defendant’s attorney, or the district attorney may petition for, or the court on its own motion may order, an examination to assist in the determination of the defendant’s present mental condition and competency to stand trial.
“(2) Mental Condition at Time of Offense. If the defendant has timely raised a defense of ‘not guilty by reason of mental disease or defect’ either by the entry of a plea or by filing a pre-trial motion pursuant to Rule 15, the court on its own motion may order, or the defendant, the defendant’s attorney, or the district attorney may move for an examination into the defendant’s mental condition at the time of the offense.”
Also, § 15-16-22(a), Ala.Code 1975, provides, in pertinent part:
“Whenever it shall be made known to the presiding judge of a court by which an indictment has been returned against a defendant for a capital offense, that there is reasonable ground to believe that such defendant may presently lack the capacity to proceed or continue to trial, as defined in Section 22-52-30, or whenever said judge receives notice that the defense of said defendant may proceed on the basis of mental disease or defect as a defense to criminal responsi *1279 bility; it shall be the duty of the presiding judge to forthwith order that such defendant be committed to the Department of Mental Health and Mental Retardation for examination by one or more mental health professionals appointed by the Commissioner of the Department of Mental Health and Mental Retardation.”
(Emphasis added.)
When he appeared before the district court after his arrest in September 2004, the appellant entered pleas of not guilty by reason of insanity, not guilty by reason of temporary insanity, and not guilty per se. Shortly thereafter, defense counsel appeared before a circuit judge and expressed concerns about the appellant’s mental faculties because he continued to talk to various people about the offense after repeatedly being advised not to. After consulting with the district judge, the circuit judge ordered that the appellant undergo a psychological examination.
When the appellant was arraigned in circuit court, he pled not guilty. He also requested thirty days to file any special pleas and specifically referenced a possible plea of not guilty by reason of insanity. After the State requested a mental examination and the defense argued that the request was premature, the following occurred:
THE COURT: Well, let’s talk about this for a second. Depending on — at some point in time I want some law to tell me whether or not I can have this Defendant evaluated. Because, frankly, he is charged with a capital offense, among other offenses, and I am inclined to make sure that we cross all Ts’ and dot all Ts’ that he is competent in every way to stand trial and render assistance to his own defense. And not that there has been any suggestion that he can’t. But out of an abundance of caution, I want to make sure that we do what’s necessary to make absolutely sure he’s given every protection of every right that belongs to him.
[[Image here]]
“PROSECUTOR: Was there something done by the district court about his competency?
“[FIRST DEFENSE COUNSEL]: I didn’t.
“[SECOND DEFENSE COUNSEL]: Judge, the district court didn’t do anything about it because we didn’t ask. However, we came to Judge Wood’s court and Judge Wood’s court granted us a psychologist. We examined the gentleman and said he is okay. But I had asked Judge Wood, because psychology can only look at his behavior, that’s not enough, I want a psychiatrist to see whether his mentality as far as physically and medically is in question. And Judge Wood at that time on the record says, okay, you get a psychologist now and I grant you a psychiatrist too. The psychiatrist has been also granted. So we need a psychiatrist and a psychologist.
“Psychologist, Judge, cannot go to the physical part of this man, just behavior. And we need him to be tested because he has been given variety of drug before and after he has been in jail.
“THE COURT: Okay. Well, it seems to me that you have invoked or at least triggered in some way the — a mental evaluation by your — by Judge Wood having already granted you the right to have a psychologist and a psychiatrist—
“[SECOND DEFENSE COUNSEL]: Yes, sir, Judge. The psychologist did his job and sent the report. I have it. It’s about 20 pages. But we still want a psychiatrist.
*1280 “THE COURT: Well, did he grant that right?
“[SECOND DEFENSE COUNSEL]: Yes, sir, Judge. He said he can have a psychiatrist too.
“THE COURT: You are not complaining about that.
“[SECOND DEFENSE COUNSEL]: No. I love it, Judge.
“THE COURT: Now, the fact that you have been granted a psychiatrist, have you obtained a psychiatrist?
“[SECOND DEFENSE COUNSEL]: No, sir, Judge. We haven’t gotten that far.
“THE COURT: What are you waiting on?
“[SECOND DEFENSE COUNSEL]: For Your Honor — to be in your court, Judge. Because that was—
“THE COURT: All right. Well, you are free to go find a psychiatrist.
“[SECOND DEFENSE COUNSEL]: Yes, sir.
“THE COURT: Judge Wood has granted it. I would have granted it myself,—
“[SECOND DEFENSE COUNSEL]: Yes, sir.
“THE COURT: — if he hadn’t. That being the case, I’m going to grant the State’s motion to have him examined....”
(R. 28-31.)
Although Rule 11.2(a)(1), Ala. R.Crim. P., applies only to defendants who are “before a circuit court,” Rule 11.2(a)(2), Ala. R.Crim. P., does not. Rather, Rule 11.2(a)(2), Ala. R.Crim. P., applies “[i]f the defendant has timely raised a defense of ‘not guilty by reason of mental disease or defect.’” Based on the appellant’s not guilty by reason of insanity and not guilty by reason of temporary insanity pleas in district court, it appears that the State properly requested a mental examination even though the appellant had not yet entered similar pleas in the circuit court. Also, § 15-16-22, Ala.Code 1975, provides that, if a circuit court receives notice that a capital defendant “may proceed on the basis of mental disease or defect as a defense to criminal responsibility,” it should order a mental examination. Based on the information the circuit court had concerning the appellant’s pleas in district court, the previous proceedings in the circuit court, and counsel’s reservation concerning special pleas, the circuit court could have reasonably concluded that the appellant might proceed on the basis of a plea of not guilty by reason of insanity. Therefore, it did not err in granting the State’s motion for a mental evaluation.
VI.
The appellant’s sixth argument is that the trial court improperly granted the State’s challenges for cause of Venire-members J.B. and R.J. based on their views regarding capital punishment.
“On the trial for any offense which may be punished capitally or by imprisonment in the penitentiary, it is a good cause of challenge by the state that the person would refuse to impose the death penalty regardless of the evidence produced or has a fixed opinion against penitentiary punishment or thinks that a conviction should not be had on circumstantial evidence, which cause of challenge may be proved by the oath of the person or by other evidence.”
12-16-152, Ala.Code 1975.
“The trial judge is given much discretion in determining whether a potential juror should be struck for cause. According to Rule 18.4(e), Ala. R.Crim. P.:
“ ‘When a prospective juror is subject to challenge for cause or it reasonably *1281 appears that the prospective juror cannot or will not render a fair and impartial verdict, the court, on its own initiative or on motion of any party, shall excuse that juror from service in the case.’
[[Image here]]
“Furthermore, in order to determine whether the trial judge’s exercise of discretion was proper, this Court will look to the questions directed to and answers given by the prospective juror on voir dire. Ex parte Cochran, 500 So.2d 1179 (Ala.1986).”
Holliday v. State, 751 So.2d 533, 535 (Ala.Crim.App.1999). Aso, “ ‘[t]he trial judge is in the best position to hear a prospective juror and to observe his or her demean- or.’ ” McNair v. State, 653 So.2d 320, 324 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994) (quoting Ex parte Dinkins, 567 So.2d 1313, 1314 (Aa.1990)). Finally,
“[t]he test for determining whether a strike rises to the level of a challenge for cause is ‘whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence.’ Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App.1991). ‘Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.’ Ex parte Nettles, 435 So.2d 151, 153 (Ala.1983). ‘The decision of the trial court “on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion.” ’ Nettles, 435 So.2d at 153.”
Dunning v. State, 659 So.2d 995, 997 (Ala.Crim.App.1994).
In response to general questioning, Veniremember J.B. initially indicated that he absolutely would not be able to impose the death penalty. (R. 644.) During individual questioning, the following occurred:
“THE COURT: You told me you had an issue with the death penalty. Tell me what that is.
“[VENIREMEMBER J.B.]: Well, let me just make sure I understand it. This is—
“THE COURT: And, by the way, I want to let you know something. When I say you have an issue with it, I don’t care what your position is. But I just want to know what it is.
“[VENIREMEMBER J.B.]: And this is based on the four counts that you read; is that correct.
“THE COURT: It’s based on your belief and whether or not you could impose the death penalty under any set of circumstances.
“[VENIREMEMBER J.B.]: Not just this case. Under any circumstances.
“THE COURT: Any — based on the facts in — well, let me just put it this way: If you were selected to serve on this jury, and you listened to the evidence in this case, and you believe that the State of Aabama proved beyond a reasonable doubt that Jeremy Jones was guilty of one or more of the counts as alleged in that indictment, at the penalty phase they are going to put — the State is going to put on aggravating circumstances and the Defense is going to put on mitigating circumstances.
“Once you have heard all of that, is there any way that you could imposed the death penalty?
“[VENIREMEMBER J.B.]: No.
“THE COURT: [Defense counsel],
“[DEFENSE COUNSEL]: [Venire-member J.B.], when you were originally answering the questions, you — it appeared you were saying, or maybe I misunderstood, you were asking about whether in any case you could ever consider the death penalty. Not just this *1282 case, in the world, is there any set of circumstances you could imagine where you could vote to impose the death penalty? Could you under some circumstances? Not talking about this case right now.
“[VENIREMEMBER J.B.]: Yes, I could.
“[DEFENSE COUNSEL]: That would be a decision that you could reach somewhere under some circumstances.
“[VENIREMEMBER J.B.]: That’s correct.
“[DEFENSE COUNSEL]: Ah right. And these cases are two-part trials. You understand that?
“[VENIREMEMBER J.B.]: Uh-huh.
“[DEFENSE COUNSEL]: First part is guilt or innocence. You wouldn’t have any problem with that; would you?
“[VENIREMEMBER J.B.]: No, sir.
“[DEFENSE COUNSEL]: Second part is the guilty phase — the sentencing phase. I am sorry. And that’s where the jury decides whether death is an appropriate penalty or life without is the appropriate penalty. Are you with me?
“[VENIREMEMBER J.B.]: Yes, sir.
“[DEFENSE COUNSEL]: And at that point the State is going to put on what they think are aggravating factors. That means things that they think would indicate that death was the appropriate penalty.
“We would put on from our side what are called mitigating factors, things that we would indicate — feel would indicate that life without parole would be the appropriate penalty? Do you understand that?
“[VENIREMEMBER J.B.]: (Nods head affirmatively.)
“[DEFENSE COUNSEL]: Just like you hear evidence in the first part.
“[VENIREMEMBER J.B.]: Uh-huh.
“[DEFENSE COUNSEL]: Then the judge tells you what the law of Alabama is about how to consider these things.
“[VENIREMEMBER J.B.]: Uh-huh.
“[DEFENSE COUNSEL]: Are you with me?
“Under those circumstances, could you at least consider the death penalty? Nobody is asking you to say, yeah, I’m going to do it or, no, I’m not going to do it. The question is: Would you be able to consider that as a possible sentence after you — and, again, you haven’t heard the evidence yet and you don’t know what it is going to be. Would you at least be able to consider that as a possible sentence?
“[VENIREMEMBER J.B.]: Yes. I will just say yes.
“[DEFENSE COUNSEL]: Thank you.
“THE COURT: Under what set of circumstances would you be able to impose the death penalty?
“[VENIREMEMBER J.B.]: I mean, you want like specifics?
“THE COURT: Well, you said — you told me earlier that you couldn’t in this case. Is that right?
“[J.B.]: Yes, sir.
“THE COURT: Under what set of circumstances could you?
“[VENIREMEMBER J.B.]: That’s a tough question. And, honestly, I don’t know if I have the answer. I guess I just don’t think that, you know, the concept of an eye for an eye is the best way to go.
“THE COURT: So you can’t — you really can’t give me a set of circumstances were you think it would be appropriate?
“[VENIREMEMBER J.B.]: No.
“THE COURT: Thank you. State?
*1283 “[PROSECUTOR]: Let me give yon a specific circumstance. Let’s say that Osama Bin Laden is caught and you believe he’s killed one million people. Could you consider it then?
“[VENIREMEMBER J.B.]: As a possibility?
“[PROSECUTOR]: Right.
“[VENIREMEMBER J.B.]: Yes.
“[PROSECUTOR]: But could you actually vote for it if he was on trial? You said could you consider it. But would you ever vote for it?
“[VENIREMEMBER J.B.]: In that circumstance, yes.
“[PROSECUTOR]: Okay. Is the difference in that circumstance — you said earlier you couldn’t vote for an eye for an eye — because it’s one million eyes instead of one person?
“[VENIREMEMBER J.B.]: Correct. To me there is a difference between one person and multiple persons.
“[PROSECUTOR]: But in this case if the State has only proven that one person was killed, is there anything that we can put on to you in the penalty phase of this case that you would ever vote to impose the death penalty for one victim?
“[VENIREMEMBER J.B.]: I don’t think so.
“[PROSECUTOR]: That’s all, Your Honor.”
(R. 773-79.)
Veniremember R.J. also initially indicated that he absolutely would not be able to impose the death penalty. (R. 644.) During individual questioning, the following occurred:
“THE COURT: [Veniremember R.J.], you indicated this morning, or yesterday, or sometime that you would, under no set of circumstances, impose the death penalty. Is that correct?
“[VENIREMEMBER R.J.]: I do not agree with the death penalty.
“THE COURT: Okay. The fact that you don’t agree with it is one standard. The question that I would have is: If the evidence in this case indicated a set of facts and there was circumstances involved, could you impose the death penalty?
“[VENIREMEMBER R.J.]: No. I still disapprove of the death penalty.
“THE COURT: All right. Under any set of facts or scenario, no matter how egregious or how heinous they may be, are you telling me that you could not impose the death penalty?
“[VENIREMEMBER R.J.]: Yes, sir.
“THE COURT: All right. [Defense counsel].
“[DEFENSE COUNSEL]: [Venire-member R.J.], you understand that on these capital cases it’s a two-part trial.
• “[VENIREMEMBER R.J.]: I understand.
“[DEFENSE COUNSEL]: The first part is whether somebody is guilty or not, and there is the sentencing part. Would you have any problem on the guilt part, deciding if somebody is guilty?
“[VENIREMEMBER R.J.]: No, I wouldn’t have any problem with that.
“[DEFENSE COUNSEL]: So your problem would be on the tail end, the sentencing part?
“[VENIREMEMBER R.J.]: Yes. Uh-huh.
“[DEFENSE COUNSEL]: Now, in the sentencing part, and I don’t mean to belabor this, I know it’s been a long day and you have heard some of this already, but in the sentencing part the district attorney or the prosecutor puts on evidence that they think indicates that the person deserves to be put to *1284 death, and that that’s the appropriate sentence. And then the Defense, on the other hand, gets to put on what we call mitigating factors which we say would indicate that the person shouldn’t be put to death.
“[VENIREMEMBER R.J.]: Uh-huh.
“[DEFENSE COUNSEL]: So in a sense you are kind of doing like you would do in a regular trial. You are hearing the evidence, and then you are going to have to weigh the evidence, and the judge will tell you what the law is in Alabama about how you weigh that evidence and how you come to some determination. You haven’t heard any evidence yet and nobody is trying to get you to commit that you are going to vote in any way.
“[VENIREMEMBER R.J.]: Uh-huh.
“[DEFENSE COUNSEL]: But what we’re about is whether or not you would be able to consider both alternatives, weigh that evidence, whatever it is, and we don’t know yet and I understand that, but to weigh that evidence and then vote for whatever you think the appropriate penalty, whether that be the death penalty or life without, for whatever — you would be able to consider both of them and then vote whatever in your heart you felt was the appropriate penalty. Can you do that?
“[VENIREMEMBER R.J.]: Yes, I don’t have any problem with that.
“[DEFENSE COUNSEL]: Thank you.
“THE COURT: If I told you that you would have two choices if you believe that this Defendant, Jeremy Jones, was guilty of a capital murder offense, you would have two choices in the penalty phase — life in prison without the possibility of parole, or death — is there any set of circumstances that you could impose death?
“[VENIREMEMBER R.J.]: Well, I’m going to make a decision on my personal beliefs.
“THE COURT: Is there any way that you could impose death where you have two choices — of life without parole and death?
“[VENIREMEMBER R.J.]: I don’t think I could choose death.
“THE COURT: [Prosecutor],
“[PROSECUTOR]: You can’t think of any circumstance where you would impose the death penalty?
“[VENIREMEMBER R.J.]: No, sir.
“[PROSECUTOR]: You would always go with life without parole?
“[VENIREMEMBER R.J.]: Yes, sir.
“[PROSECUTOR]: Thank you.
“[DEFENSE COUNSEL]: Judge, can I? You haven’t heard any facts in this case. And I understand that. And, again, nobody is asking you to judge this case. Regardless of whether you can call to mind some horrible scenario in some other theoretical case, in this case we’re talking about right now, if they came in and the judge tells you what the aggravating factors — what that means, and they put on their case, and if they prove to you that under the law that’s an appropriate sentence, not saying that you to have to vote that way, but that that’s an appropriate sentence, could you at least consider and if you felt in your heart of hearts that was the right thing to do, could you vote for it?
“[VENIREMEMBER R.J.]: If it was the law and that’s what the sentence was, that I could — you know, I am a man that follows the law. And if that was the law, then I would.
“[DEFENSE COUNSEL]: Thank you, sir.
*1285 “[PROSECUTOR]: [Veniremember R.J.], you just told us a minute ago— and there is no wrong answer in here. No one is picking on you. But you just told me a minute ago that you would never impose the death penalty ever if the option was life without parole; that you would always go with life without parole.
“[VENIREMEMBER R.J.]: Yes, I did say that, sir.
“[PROSECUTOR]: And is that your feeling?
“[VENIREMEMBER R.J.]: Yes, sir. And, again I say, if that’s the law that was put forth in front of me for that particular time, because I am a man of law, then—
“[PROSECUTOR]: Well, it is not the law, [R.J.]. The issue is that if you sat on the jury and believed the State’s evidence and found the defendant guilty, then you would go on to the penalty phase.
“[VENIREMEMBER R.J.]: Yes, sir.
“[PROSECUTOR]: And there you would only have two options. One is death, one is life without parole. And you told me a minute ago that you would always go with life without parole; you would never choose death if you had that option.
“[VENIREMEMBER R.J.]: My personal belief I would be opposed to the death penalty.
“[PROSECUTOR]: Thank you.”
(R. 985-90.)
Based on their responses, the trial court could have reasonably concluded that the challenged veniremembers were ineligible to serve pursuant to § 12-16-152, Ala. Code 1975. Therefore, the trial court did not err in granting the State’s challenges for cause of these veniremembers based on their feelings about the death penalty.
Moreover, even if the trial court did err in removing Veniremembers J.B. and R.J., the appellant has not made any showing that the jury that tried him was not fair and impartial. Therefore, error, if any, in the trial court’s granting of the State’s challenges for cause was harmless. See Evans v. State, 794 So.2d 411 (Ala.2000).
VII.
Pursuant to § 13A-5-53, Ala.Code 1975, we are required to address the propriety of the appellant’s convictions and sentence of death. The appellant was indicted for and convicted of four counts of capital murder because he committed the murders during the course of a rape or an attempted rape, see § 13A-5-40(a)(3), Ala. Code 1975; a sexual abuse or an attempted sexual abuse, see § 13A-5-40(a)(8), Ala. Code 1975; a burglary, see § 13A-5-40(a)(4), Ala.Code 1975; and a kidnapping or an attempted kidnapping, see § 13A-5-40(a)(1), Ala.Code 1975.
The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5 — 53(b)(1), Ala.Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. It found that the State proved the existence of three aggravating circumstances: 1) that the appellant committed the capital offense while he was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, a burglary; 2) that the appellant committed the capital offense while he was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, a rape; 3) and that the appellant *1286 committed the capital offense while he was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, a kidnapping. See § 13A-5-49(4), Ala.Code 1975. The trial court did not find that any statutory mitigating circumstances existed. With regard to nonstatu-tory mitigating circumstances, the trial court made the following findings:
“Under Section 13A-5-47(d), this Court must also consider each of the non-statutory mitigating circumstances interjected by Jones. Under Section 13A-5-52, this Court recognizes that a non-statutory mitigating circumstance can include evidence concerning the defendant’s character, life, or record; the facts of the crime; mercy for the defendant; and any other relevant information for sentencing purposes.
“Because non-statutory mitigators are wide-ranging, it is difficult to list every possible way to label them. This Court’s outline of non-statutory miti-gators is based on Jones’ requested jury instructions for mitigating circumstances and any additional circumstances this Court heard during the sentencing phase. As outlined below, this Court has considered each of these non-statutory mitigating circumstances. To the extent that some piece of evidence, theory, or testimony concerning a non-statutory mitigator does not fit into the categories below, this Court avers that it did consider all relevant evidence produced by Jones and gave such evidence its appropriate weight.
“a. Childhood Problems: Jones’ mother and step-father testified to their humble existence during Jones’ upbringing. For example, they testified that while Jones suffered from attention deficit disorder early in life, they did not have the means to diagnosis or treat Jones’ problem. Furthermore, Jones’ mother testified that the couple fought during Jones’ childhood and that Jones’ stepfather often drank alcohol. This Court finds that this mitigator was sufficiently interjected by Jones and not disproved by the State. Accordingly, this Court gives this mitigator some weight.
“This weight is relatively minor, however, based on the testimony of Jones’ parents. During the sentencing phase testimony, it became apparent that Jones grew up in a family that loved and cared for him, and that his step-father provided at least some fatherly guidance in Jones’ life. In fact, this Court takes judicial notice that Jones’ family loved Jones enough to travel from Oklahoma to support their son during the trial. That Jones’ family grew up with meager means and some turmoil is mitigating; yet, a lack of affluence and having parents who fight are common in many persons who do not grow up to commit rape and murder.
“b. Mercy: Jones’ attorneys and his family pleaded for the jury to show mercy for Jones, and Jones’ parents testified concerning the impact on Jones’ family should he be sentenced to death. While it is impossible to quantify a plea of mercy, this Court finds that Jones sufficiently raised the issue and it was not (and cannot be) disproved by the State. As a result, this Court gives Jones’ plea for mercy some weight as a non-statutory mitigator.
“c. Drug Abuse: The evidence at the sentencing phase of Jones’ trial established that Jones has a long history of abusing illegal substances. The State did not disprove this non-statutory miti-gator; in fact, the State’s own expert agreed that Jones’ drug use was likely his main mental and social problem. Accordingly, this Court finds this non- *1287 statutory mitigator to exist and assigns some weight.
“This weight, however, is minor. The evidence showed that Jones’ continued drug use was not only voluntary, it did not impact his ability to understand right from wrong in any way. Voluntary drug abuse, in itself, is not an excuse for criminal behavior — especially murder. Accordingly, this Court assigns very little weight to this mitigating circumstance.
“d. Capacity for Love and Care: Jones’ family testified that Jones has a capacity to love and care for others. Specifically, they testified concerning his love and care for his younger brother, who looks up to Jones as a role model according to Jones’ family. The defendant interjected this non-statutory miti-gator, and it was not disproved by the State. Accordingly, this Court assigns it some weight.
“e. Mental and Emotional Problems: Jones’ psychological expert testified that Jones suffered from attention deficit disorder and schizo-affective disorder, in addition to his drug abuse problems. The State’s expert countered that Jones’ mental and social problems stemmed from his voluntary drug use, a self-centered personality, and an antisocial behavior disorder. Both experts agreed that Jones suffered from some type of mental and emotional problem. Consequently, the Court finds this non-statutory mitigator to exist and assigns it some weight.
“Again, this mitigator is assigned very little weight, however. Both experts also agreed that, whatever Jones’ mental health problems were, they did not affect his capacity to know right from wrong or cause him to lose touch with reality. Nor did they find that Jones’ mental disorders would have caused him to commit rape or murder (other than Dr. McKeown’s testimony concerning Jones’ self-centered mentality). Accordingly, this Court finds that none of Jones’ mental problems caused him to commit the vile acts in the present case. Therefore, this non-statutory mitigator weighs lightly in this Court’s determination of Jones’ sentence.”
(C.R. 439-43.) The sentencing order shows that the trial court weighed the aggravating circumstances and mitigating circumstances and correctly sentenced the appellant to death. The record supports its decision, and we agree with its findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant’s sentence of death. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
As required by § 13A. — 5—53(b)(3), Ala. Code 1975, we must determine whether the appellant’s sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. The appellant committed the murder during the course of a rape, a sexual abuse, a burglary, and a kidnapping. Similar crimes are being punished by death throughout this state. See Lewis v. State, 889 So.2d 623 (Ala.Crim.App.2003); Barbour v. State, 673 So.2d 461 (Ala.Crim.App.1994); Hunt v. State, 659 So.2d 933 (Ala.Crim.App.1994), aff'd, 659 So.2d 960 (Ala.1995). Therefore, we find that the sentence was neither disproportionate nor excessive.
Finally, we have searched the entire record for any error that may have adversely affected the appellant’s substantial rights, and we have not found any. See Rule 45A, Ala. RApp. P.
*1288 Accordingly, we affirm the appellant’s convictions and sentence of death.
AFFIRMED.
McMILLAN, SHAW, WISE, and WELCH, JJ., concur.

. When asked what description best fit the appellant based on what they had heard, 39 percent said serial killer, 13 percent said murderer, 14 percent said a mentally ill person, 5 percent said none of the above, and 30 percent said they did not know or the question was not applicable. However, the trial court questioned the validity of the responses because the question was a push/pull question that suggested three very negative possibilities.

. Although the appellant challenged the testimony of additional witnesses in his brief, he specifically abandoned his argument as to any witnesses other than Cartee during oral argument before this court.