MAIN, Judge.
 

 The State appeals from the circuit court’s order granting Larry Reynold Smith’s Rule 32, Ala.R.Crim.P., petition for postconviction relief.
 

 In August 1995, Smith was convicted of capital murder and was sentenced to death. Smith’s conviction and sentence were affirmed on appeal. See
 
 Smith v. State,
 
 727 So.2d 147 (Ala.Crim.App.1998), aff'd, 727 So .2d 173 (Ala.1999), cert. denied, 528 U.S. 833, 120 S.Ct. 91, 145 L.Ed.2d 77 (1999). This Court issued the certificate of judgment on January 26, 1999.
 

 On September 27, 2000, Smith filed a Rule 32 petition, challenging his conviction and sentence.
 
 [1]
 
 Over the course of the next six years, Smith filed multiple amendments to his petition. The State filed a number of responses to Smith’s petition and the amendments thereto. On March 3, 2004, the circuit court conducted a hearing on the State’s motion to dismiss. On July 15, 2004, the circuit court summarily dismissed a number of Smith’s claims on procedural and/or pleading grounds. On November 6, 2006, the circuit court conducted an evidentiary hearing on the remainder of Smith’s claims. On January 12, 2007, the circuit court issued a detailed written order granting Smith’s Rule 32 petition and ordering that a new trial be conducted. This appeal by the State followed.
 

 This Court set out the following statement of facts in its opinion in Smith’s direct appeal:
 

 “Chief Investigator Mike Whitten of the Marshall County Sheriffs Department testified that he received a report
 
 *1067
 
 on September 29, 1994, that Dennis Harris was missing. He stated that he then began to talk with various individuals and determined that Harris had last been seen on September 23, 1994. Whitten testified that on the night of October 3, 1994, he received a report that Harris’s body had been discovered. At approximately 11:00 p.m., Whitten located Harris’s body in a wooded area in Marshall County, approximately 100 yards from a dirt road. He testified that the area was secured and that a deputy remained on the scene until Whitten and other officials returned early the following morning.
 

 “Whitten stated that the scene remained unchanged overnight and that the weather conditions were constant. Photographs were taken of the body and the surrounding area. Whitten stated that Harris’s body was lying face down and was badly decomposed. He stated that the head had completely separated from the body. The skull was exposed, having been separated entirely from the scalp and hair. Harris was wearing a plaid shirt and shoes with no socks. Whitten testified that it appeared that Harris had died as a result of a gunshot wound to the head.
 

 “Whitten testified that he began to investigate the case as a homicide and also said that he questioned many of the people he had spoken with in investigating the missing persons report. In the course of the investigation, Whitten learned that Harris was a friend of Smith’s and that he was a best friend of Tanya, Smith’s wife. Whitten stated that he received a telephone call from Carl Cooper, an acquaintance of both Smith and Harris, and that based on the information Cooper gave him, he narrowed his investigation to Smith.
 

 “Cooper testified that he had known Smith for six or seven years and that he had been acquainted with Harris for approximately one year. He stated that he met Harris through Smith, and that he had also previously worked with Harris. Cooper testified that he would see Harris at Smith’s mother’s apartment or at Harris’s apartment. He testified that he had read a newspaper report of Harris’s disappearance and that he informed the authorities of a conversation he had -with Smith about plans to rob Harris. Cooper testified that, before the murder, he and his wife discussed with Smith and his wife, Tanya, the idea of robbing Harris of cash. Cooper testified that the plan was for Smith and him to cover their faces, hit Harris in the head, take his glasses (without which Harris purportedly could not see) and rob him. Cooper testified that he originally thought the idea was a joke, but that when a similar conversation took place again later, he told Smith that he wanted nothing to do with the plan. Cooper also stated that he had seen Smith borrow money from Harris more than once.
 

 “Cooper further testified that he saw Smith with a nickel-plated .25 caliber semi-automatic weapon with a black handle and a black holster. Cooper testified that Smith told him that he had stolen the gun from ‘a man named Larry1 who lived at the Overlook Mountain Lodge.
 

 “Larry Moffett testified that in September 1994, he was living at the Overlook Mountain Lodge, and that Smith lived ‘just [a] couple doors down.’ He stated that in the summer of 1994, he purchased a .25 caliber chrome gun with a black handle and a black holster. Moffett testified that Smith had looked at the gun and had offered to buy it. Moffett testified that he did not sell Smith the gun, and that he kept it on the nightstand by his bed. He stated
 
 *1068
 
 that he later noticed that the gun was missing from his nightstand. He said that he confronted Smith and that Smith denied taking the gun.
 

 “Amanda Elkins, a co-worker of Harris’s, testified that at approximately 1:00 a.m. on Friday, September 23, 1994, she and Harris left work and went to El-kins’s house, where they watched television until approximately 4:30 a.m. Elkins testified that Harris left and that she never saw him again. She further stated that when he left, he was wearing gray pants and a red plaid shirt. She did not become aware of his disappearance until over a week later.
 

 “Kevin Harville testified that he had become acquainted with Harris after an automobile accident involving Harris. Harville testified that Harris owed him some money as a result of the automobile accident. He stated that since Harris was paid on Thursdays, he would go to his room every Friday to collect a payment towards the debt. Harville testified that he saw Smith and Harris at Harris’s hotel room on a Friday in September, sometime between 11:30 a.m. and 12:30 p.m. He stated that he returned to Harris’s room the following Friday; however, Harris did not come to the door. Harville later learned that Harris had been reported missing.
 

 “Brent Wheeler, an expert in firearms, testified that he examined some bullets or projectiles delivered to him in connection with the Harris homicide. He stated that he was able to determine that they had been fired from a .25 caliber automatic pistol. Wheeler also testified that he went to the scene of the murder and discovered two .25 caliber Remington cartridge cases near where the body was located. He testified that he was able to determine that both shell casings had been fired from the same weapon.
 

 “Dr. Joseph Embry, the state medical examiner, testified that when he received Harris’s body, it was clothed in a short-sleeved plaid, reddish brown and tan shirt. He stated that the head was essentially skeletonized. There was a 1/4 inch hole in the right side of the back of the skull that displayed characteristics of a gunshot wound. Dr. Embry found a bullet inside the skull. Dr. Em-bry also testified concerning a second gunshot wound in the left cheek area as evidenced by bone loss beginning around the nose and going out to the area below the eye. He testified that a second bullet was found under the hair. However, he testified that the cause of death was the gunshot wound to the head.
 

 “Whitten testified that he was able to verify that a gun matching the description given to him by Cooper had been stolen from Larry Moffett. Whitten stated that on October 11, 1994, he obtained an arrest warrant for Smith and that he arrested Smith at his mother’s trailer in DeKalb County. Smith was arrested for the murder of Harris and was taken to the Albertville Police Department where he was informed of his rights and was questioned. Whitten testified that Smith was questioned on two separate occasions, once by him and once by his brother, Andy Whitten. Officer Mike Whitten was present during both interviews and stated that Smith was informed of, and voluntarily waived, his rights before each interview. Whit-ten stated that Smith gave a tape-recorded statement admitting to robbing and killing Harris.”
 

 Smith v. State,
 
 727 So.2d at 152-53 (footnote omitted).
 

 On appeal, the State argues that the circuit court erred in granting Smith’s Rule 32 petition for a number of reasons.
 
 *1069
 
 Specifically, the State contends that the circuit court erred in finding counsel’s performance ineffective for various reasons; that the circuit court erroneously applied incorrect standards of law; and that the circuit court made erroneous findings of fact and reached incorrect conclusions of law. Although we agree with the State that the circuit court’s order contains some erroneous findings, for the following reasons, we affirm the circuit court’s judgment granting the Rule 82 petition and ordering a new trial.
 

 Because the evidence presented at the evidentiary hearing in this case was conflicting, we employ the abuse-of-discretion standard of review.
 
 See State v. Hamlet
 
 913 So.2d 493, 497 (Ala.Crim.App. 2005) (“When conflicting evidence is presented ... a presumption of correctness is applied to the court’s factual determinations, and they will not be disturbed unless they are clearly erroneous.”); and
 
 Hunt v. State,
 
 940 So.2d 1041, 1049 (Ala.Crim.App. 2005) (“The standard of review this Court uses in evaluating the rulings made by the trial court is whether the trial court abused its discretion.”). Additionally, “when reviewing a circuit court’s rulings made in a postconviction petition, we may affirm a ruling if it is correct for any reason.”
 
 Bush v. State,
 
 [Ms. CR-03-1902, May 29, 2009] — So.3d -, -(Ala. Crim.App.2009).
 

 In
 
 Strickland v. Washington,
 
 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court articulated two criteria that must be satisfied to show ineffective assistance of counsel. A defendant has the burden of showing (1) that his counsel’s performance was deficient and (2) that the deficient performance actually prejudiced the defense. To prove prejudice, “[t]he defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” 466 U.S. at 694. “A reasonable probability is a probability sufficient to undermine confidence in the outcome.”
 
 Id.
 
 Furthermore, “a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.” 466 U.S. at 689.
 

 “ ‘Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf.
 
 Engle v. Isaac,
 
 456 U.S. 107, 133-34, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action “might be considered sound trial strategy.” See
 
 Michel v. Louisiana,
 
 [350 U.S. 91] at 101 [(1955)]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.’
 

 
 *1070
 

 “Strickland v. Washington,
 
 466 U.S. at 689.
 

 “ ‘ “ ‘This court must avoid using “hindsight” to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel’s actions before determining whether counsel rendered ineffective assistance.’ ”
 
 Lawhom v. State,
 
 756 So.2d 971, 979 (Ala.Crim.App.1999), quoting
 
 Hallford v. State,
 
 629 So.2d 6, 9 (Ala.Crim.App. 1992). “[A] court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.”
 
 Strickland,
 
 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.’
 

 “A.G. v. State,
 
 989 So.2d 1167, 1171 (Ala. Crim.App.2007).”
 

 Lee v. State,
 
 44 So.Bd 1145, 1154-55 (Ala. Crim.App.2009).
 

 “[T]he purpose of ineffectiveness review is not to grade counsel’s performance. See
 
 Strickland [v.
 
 Washington], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [ (1984) ]; see also
 
 White v. Singletary,
 
 972 F.2d 1218, 1221 (11th Cir.1992) (‘We are not interested in grading lawyers’ performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.’). We recognize that ‘[representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.’
 
 Strickland,
 
 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or “what is prudent or appropriate, but only what is constitutionally compelled.’
 
 Burger v. Kemp,
 
 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).”
 

 Chandler v. United States,
 
 218 F.3d 1305, 1318-19 (11th Cir.2000) (footnotes omitted).
 

 “While counsel has a duty to investigate in an attempt to locate evidence favorable to the defendant, ‘this duty only requires a
 
 reasonable
 
 investigation.’
 
 Singleton v. Thigpen,
 
 847 F.2d 668, 669 (11th Cir. (Ala.) 1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 822, 102 L.Ed.2d 812 (1989) (emphasis added). See
 
 Strickland,
 
 466 U.S. at 691, 104 S.Ct. at 2066;
 
 Morrison v. State,
 
 551 So.2d 435 (Ala.Cr.App.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990). Counsel’s obligation is to conduct a ‘substantial investigation into each of the
 
 plausible
 
 lines of defense.’
 
 Strickland,
 
 466 U.S. at 681, 104 S.Ct. at 2061 (emphasis added). ‘A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made.’
 
 Id.,
 
 466 U.S. at 686, 104 S.Ct. at 2063.”
 

 Jones v. State,
 
 753 So.2d 1174, 1191 (Ala. Crim.App.1999).
 

 With these principles in mind, we now look to the State’s claims on appeal.
 

 I.
 

 The State, in its' initial brief, sought a determination by this Court as to whether the American Bar Association (“ABA”) guidelines and the Equal Justice Initiative (“EJI”) trial manual provide the guiding rules and standards for reviewing ineffective-assistance-of-counsel claims. However, in its reply brief, the State acknowledged that, after the filing of the State’s
 
 *1071
 
 initial brief, this Court has held in another ease:
 

 “Although the ABA guidelines may, in some instances, provide guidance as to what is reasonable in terms of counsel’s representation, they are not determinative. Rather, the two-pronged analysis set forth in
 
 Strickland
 
 remains the standard for deciding ineffective-assistanee-of-counsel claims. Such a standard is sufficient to protect a defendant’s rights to both counsel and due process.”
 

 Jones v.
 
 State, 43 So.3d 1258, 1278 (Ala. Crim.App.2007).
 
 [2]
 
 Indeed, as the United States Supreme Court has articulated, “[prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards of Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) (‘The Defense Function’), are guides to determining what is reasonable, but they are only guides.”
 
 Strickland,
 
 466 U.S. at 688, 104 S.Ct. 2052. Thus, this question, as the State concedes in its reply brief, has been addressed by previous legal authority. Further, the circuit court’s order indicates that it evaluated Smith’s claims pursuant to the requirements of
 
 Strickland.
 

 II.
 

 The State argues that the circuit court improperly judged trial counsel’s efforts against those of Smith’s Rule 32 counsel. Such a comparison, the State correctly avers, is inequitable, because trial counsel was acting with one set of circumstances — i.e., the knowledge, information, resources, and time limitations trial counsel was operating under in 1995— whereas Rule 32 counsel’s investigation was conducted with the benefit of hindsight, a larger timeframe, and substantial resources. Generally speaking, the State’s assertions regarding the standard of review are correct.
 
 See, e.g., Lee,
 
 supra. However, based on our review of the record, we hold that the circuit court did not impermissibly judge trial counsel’s performance against the performance of Smith’s Rule 32 counsel. Rather, we conclude that the circuit court, in its extremely lengthy and detailed order, simply determined from the testimony and evidence presented at the evidentiary hearing on Smith’s Rule 32 petition that counsel had not provided effective assistance based on counsel’s knowledge, the time constraints counsel faced, and the resources available to counsel at the time of trial.
 

 III.
 

 To the extent that the circuit court found that, pursuant to the ABA guidelines, Jack Daniel, Smith’s trial counsel, was not qualified as a matter of law to represent Smith at trial, such a finding is incorrect. As the State correctly notes, § 13A-5-54, Ala.Code 1975, provides that indigent capital-murder defendants “must be provided with court appointed counsel having no less than five years’ prior experience in the active practice of criminal law.” Daniel met this statutory requirement. Further, as the State also notes, Daniel was retained, not appointed, and it appears that the only legal requirement pertaining to retained counsel is that counsel be licensed to practice law in the jurisdiction. However, in light of the extensive findings made by the circuit court and the numerous grounds relied upon by the circuit court in granting Smith’s petition, we hold that this error by the circuit court does not render its ultimate conclusion that counsel was ineffective at trial erroneous.
 
 [3]
 

 
 *1072
 
 IV.
 

 The State, citing a number of specific examples, contends that the circuit court improperly discounted trial counsel’s testimony at the evidentiary hearing.
 

 A.
 

 The State challenges the circuit court’s finding that trial counsel did not conduct an adequate pretrial investigation. The State contends that counsel’s ability to investigate was hampered by Smith’s family’s failure to pay the agreed-upon rate for attorney’s fees either in a timely manner or, for that matter, fully.
 
 [4]
 
 The State further avers that the circuit court discounted or ignored trial counsel’s testimony regarding the efforts he did make in investigating the case. The circuit court thoroughly set out the evidence presented at the evidentiary hearing and made detailed findings of fact in its order granting the Rule 82 petition.
 

 “13. According to Mr. Daniel’s accounting, he did not receive payments from Ms. Burkett .[Smith’s aunt] in a timely manner (Hrg. Tr. 450:1-8), and he became disturbed that Ms. Burkett was falling into arrears (id. at 455:1-4). Mr. Daniel expressed his unhappiness in a series of letters to Ms. Burkett, including one dated August 4, 1995, less than one week before the start of Mr. Smith’s trial, which read in part as follows: T cannot afford to bankroll this case. I do not need to face the next week worrying about your failure to reimburse me for these expenses rather than concentrating on the final preparation and actual presentation of Larry’s trial.’ (Id. at 453:22-455:12; Ex. 11).
 

 “14. In his testimony before the Court during the November 2006 hearing, Mr. Daniel made a series of claims about his efforts to locate and talk to witnesses to aid Mr. Smith’s defense against the State’s charges. ‘We had a whole list of people,’ he said. ‘We were trying to find anybody and everybody who could tell us as much as they could about [the Harris murder].’ (Hrg. Tr. 407:20-23). ‘[W]e undertook an investigation. We talked to a lot of people.’ (Id. 512:8-9). ‘[W]e talked to a lot of people, a lot of people. [Q:] And how many would you say a lot is? [A:] I can’t even begin to give a number. It was a lot. I mean, we talked to everybody we could talk to save that boy’s life.’ (Id. at 514:3-7). For the following reasons, the Court finds that Mr. Daniel’s sweeping claims about his and others’ efforts to find and talk to witnesses are not supported by the evidence.
 

 “a) Efforts by Mr. Daniel
 

 “15. None of the witnesses Mr. Smith called to testify at the November 2006 hearing — with the exception of Mr. Smith’s mother — recalled meeting with or speaking to Mr. Daniel or any person in his employ, although they all indicated they were available and would have
 
 *1073
 
 been willing to discuss the case in the months prior to the trial had they been approached. (Hrg. Tr. 297:28-298:6 (Sarah Johnson); 308:11-17 (Kevin Har-ville); 328:22-824:6 (Carrie Butler); 349:21-350:4 (Wanda Chambers); 369:9-370:1 (Ralph Willingham); 385:17-386:1 (Amber Steele); 557:7-558:12 (Roger Edgeworth)).
 

 “16. To rebut the evidence that Mr. Daniel conducted little or no pretrial investigation, the State called Mr. Daniel himself to testify. In his testimony, Mr. Daniel described his efforts on Mr. Smith’s behalf only in the broadest generalities. When asked repeatedly, both in direct and on cross-examination, to identify the persons he spoke with, Mr. Daniel could provide neither the names of the persons he claims he spoke to nor any details about those conversations. (Hrg. Tr. 403:20-24; 512:6-10). Mr. Daniel produced neither copies of any lists of prospective witnesses nor interview notes from meetings with any witnesses from his files to support his sweeping, general claims. Mr. Daniel claimed such notes would have been taken during witness interviews and, if they existed, would have resided in his file. (Id. at 464:3-12).
 

 “17. Mr. Daniel initially said that he tried to ‘discover or investigate’ ‘about 20’ people as part of his pretrial investigation. (Hrg.Tr-408:7-9). But later he equivocated, saying that while he thought he gave his investigator, Walter Spain, 20 names, T don’t know what we gave him.’ (Id. at 507:15-18). Mr. Daniel said initially: ‘We tried to talk to several people during that time.... A lot of these people tried to make themselves scarce.... They didn’t want to talk to us.’ (Id. at 407:14-17). Later, when asked: ‘Did you ever have someone tell you they weren’t going to talk to you about the case?’ Mr. Daniel replied: ‘Not so much that we weren’t going to talk, but, you know, they were just— they were just real evasive.’ (Id. at 415:23^416:2).
 

 “18. At one point, Mr. Daniel admitted on cross-examination that his investigation, if there was one, was quite limited:
 

 “ ‘Q: Because of that confession, you didn’t really believe there was much need to investigate other issues related to [Mr. Smith’s] guilt, did you?
 

 “ ‘A: The way it looked on the face of it and through everything that we got, I mean, that was the case, I mean, you take a case apart and look at the ballistics. They didn’t have any ballistics; forensic science end of it; the body; the way everything was—
 

 “ ‘Q: — Just so we can keep the record clear, I take it that means that your focus in the investigation was on the confession?
 

 “‘A: Right.
 

 “ ‘Q: And not on other matters?
 

 “‘A: Right.’
 

 “(Hrg. Tr. 460:23^61:11).
 

 “19. When Mr. Daniel did say he remembered speaking to a particular person, or investigating a particular fact, what he remembered was trial testimony — not anything that occurred in his purported pretrial investigation. For example, when asked ‘Do you remember speaking with anyone named Amanda Elkins?’ Mr. Daniel answered: Yeah, she was on
 
 cross-examination,
 
 but I can’t remember — really remember what the gist of her
 
 testimony
 
 was.’ (Hrg. Tr. 417:12-16) (emphasis added). When asked ‘Do you remember speaking to [Ray Thomas]?’ Mr. Daniel answered: Yeah, and I believe that was — there was some strange
 
 testimony in that case
 
 and I think he was one of the ones that he
 
 *1074
 
 tried to insinuate that there was some kind of homosexual relationship going on between Mr. Harris and my client, which I thought was totally ridiculous/ (Id. at 417:17-24) (emphasis added).
 
 [5]
 
 And when asked ‘Did you ever investigate the fact that someone may have loaned Larry money the day the victim disappeared to make a car payment?’ Mr. Daniel answered: ‘There was
 
 some testimony
 
 about that, but I forgot who it was — who gave that testimony.’ (Id. 418:18-23) (emphasis added). In each case, Mr. Daniel did not remember — and his testimony did not reflect — that he conducted any pretrial investigation. He remembered only what happened at the trial itself.
 

 “20. The Court notes that one reason Mr. Daniel may have confused his purported pretrial investigation with the actual trial testimony of witnesses may be that he treated them as one and the same. As noted, the only witness to testify before this Court at the November 2006 hearing who had ever spoken to Mr. Daniel was Mr. Smith’s mother, Sherry Miller. She was the first witness Mr. Daniel called during the defense case at the guilt-phase of Mr. Smith’s trial. (Trial Tr. 1247:23-1248:2). Yet Mr. Daniel never met nor spoke with Ms. Miller until the morning that Mr. Smith’s trial started. (Hrg. Tr. 529:12-22). And he spent no time preparing her for her testimony. (Id. at 530:2-6).
 

 “b) Efforts by people employed by Mr. Daniel
 

 “21. Mr. Daniel also claimed that he employed others to assist with the investigation and preparation of this case. The only persons employed by Mr. Daniel, however, were Jan Wilburn, Bridgette Browning, Angela Smith and Walter Spain. Of these, only Mr. Spain was involved in any pretrial investigative work. (Hrg. Tr. 456:10-22; 457:1-14; 476:2-477:3).
 

 “22. Jan Wilburn is Mr. Daniel’s ex-wife. (Hrg. Tr. 476:7-8). According to Mr. Daniel, ‘[s]he handled the accounts, bookkeeping, some of the typing. Basically, she was the office manager at the time.’ (Id. at 476:10-12). Mr. Daniel conceded that Ms. Wilburn was not an investigator (id. at 476:13-14), and the Court finds that she did not make any effort to locate or speak to any witnesses to prepare Mr. Smith’s case.
 

 “23. Bridgette Browning worked as a legal assistant in Mr. Daniel’s office. (Hrg. Tr. 476:15-16). Mr. Daniel described her as someone who ‘basically assisted me with the trial, she was hunting some people down.’ (Id. at 408:18-20). ‘Her main duty,’ he said, ‘was organizing the file trying to, you know, get potential witness prospects lined up, finding them; making phone calls and getting this — helping get this case ready to go to court.’ (Id. at 410:6-10). That work, however, was performed at the trial itself — it was not part of any pretrial investigation. (Id. at 464:21-24). The closest thing to an investigative function that Mr Daniel suggested for Ms. Browning was looking into criminal backgrounds of witnesses, though no such background checks in this case were identified (Id. at 476:20^4773). Thus, as with Jan Wilburn, the Court finds that Ms. Browning did not make any effort to locate or speak to any witnesses to prepare Mr. Smith’s case.
 

 “24. Angela Smith was a paralegal. (Hrg. Tr. 410:21-24). Her billing statement indicates she spent 12.6 hours working on Mr. Smith’s case. (Ex. 11). That time was spent drafting pleadings and researching case law. (Id.) Ms. Smith’s billing records do not indicate she spent any time investigating the
 
 *1075
 
 facts and circumstances of this case and Mr. Daniel did not describe any efforts she made to do so. (Id.) Accordingly, the Court finds that Ms. Smith did not make any effort to locate or speak to any witnesses to prepare Mr. Smith’s case either.
 

 “e) Efforts by Walter Spain
 

 “25. The only investigator Mr. Daniel retained to work on Mr. Smith’s case was Walter Spain. (Hrg. Tr. 459:9-11). Mr. Smith called Mr. Spain and the Court heard his testimony at the November 2006 hearing.
 

 “26. Mr. Spain had no meaningful investigative experience. He had never before investigated a criminal case, let alone a murder case. (Hrg. Tr. 34:20-22). His only prior law enforcement experience was as a patrolman in Home-wood, Alabama for three months in 1962 — over thirty years before his involvement in Mr. Smith’s defense. (Id. at 35:4-14). He received no formal training for that position and never performed any investigative work. (Id. at 35:20-36:3). He described his duties simply as ‘patrol traffic, direct traffic, make tickets.’ (Id., at 35:17).
 

 “27. While working as an office assistant for Mr. Daniel, Mr. Spain founded the Eagle Eye Detective Agency. (Hrg. Tr. 38:3-8). Mr. Spain was Eagle Eye’s only employee (id. at 38:9-11), and its principal business was as a process server in divorce actions for Mr. Daniel and other attorneys in Huntsville. (Id. at 38:6-8) Other than the work Mr. Spain did for Mr. Smith’s case, he never performed any investigative work in any criminal matters. (Id. at 38:12-14).
 

 “28. Mr. Spain did not begin his investigation into the facts and circumstances of Mr. Smith’s case until August 1, 1995 — the week before the start of Mr. Smith’s trial and five months after Mr. Daniel was retained as counsel. (Hrg. Tr. 42:9-11; Ex. 1). Some days prior to August 1, Mr. Daniel gave Mr. Spain a list of four to five persons to investigate, although neither Mr. Daniel nor Mr. Spain remember whose names were on that list. (Id., at 39:21-23; 42:17-18; 45:13-17; 46:18-23). According to Mr. Spain, Mr. Daniel expressly advised him not ‘to spend a lot of time on it.’ (Id. at 45:16-17).
 

 “29. On August 1, 1995, Mr. Spain spent one hour ‘on phone investigation to find out whether Ray Thomas was still at Barnett’s Auto Repair and info on Overlook Motel & Apartments about owner, manager & other information.’ (Hrg. Tr. 41:24-42:4; Ex. 1). On August 3,1995, Mr. Spain ‘spent 4 hours on trip to Guntersville and Albertville to interview Ray Thomas and owner of Overlook.’ (Hrg. Tr. 43:4-9; Ex. 1). The round trip driving distance was 112 miles and took approximately two of the four hours Mr. Spain spent working on Mr. Smith’s case on August 3, 1995. (Hrg. Tr. 43:16-22). Accordingly, between August 1 and 3, 1995, Mr. Spain spent only approximately three hours total investigating for Mr. Smith’s defense.
 

 “30. At no time did Mr. Spain ever speak to Mr. Smith about the case. (Hrg. Tr. 39:11-16). His work was limited to the approximately three hours he spent on August 1 and August 3, 1995, because Mr. Daniel told him ‘that’s all he needed.’ (Id. at 47:5). Mr. Spain submitted only the single bill (Ex. 1) for his work on Mr. Smith’s case (Id. at 40:13-18; 41:17-20), and he said that if something was not reflected in that bill, then he did not do it. (Id. at 44:2-10).
 

 “31. The Court finds that the three hours plus driving time Mr. Spain spent investigating the facts and circum
 
 *1076
 
 stances of this case represent the totality of Mr. Daniel’s pretrial investigation.
 

 “d) Court assistance
 

 “32. Even though Mr. Smith was an indigent defendant who was having difficulty paying Mr. Daniel’s bills, Mr. Daniel never sought money from the Court to pay for a professional investigator. He asserted (Hrg. Tr. 427:5-7) that the Court would not have granted such assistance because, he says, it capped the funds it was willing to make available for an investigator or other experts at $3,500, which Mr. Daniel spent on a jury expert.
 

 “33. Mr. Daniel later testified that he did not recall if he ever asked the Court for additional funds, but he said Tf I did, it would be in the record.’ (Hrg. Tr. 519:15-16). There is nothing in the record of this case that such a request was made. Thus, this Court finds that Mr. Daniel made no effort to obtain additional funds from the Court. The Court further finds that Mr. Daniel’s assertion that additional funds would not have been made available is not supported by the evidence.
 

 (C. 17-26; one footnote omitted.)
 

 Further, the circuit court concluded that, had counsel spoken with some of the trial witnesses before the day of trial, he would have discovered additional facts than those elicited at trial; the circuit court also noted that two additional fact witnesses were available and indicated that they would have testified at trial. With regard to one witness who testified at trial, the circuit court found:
 

 “40. At trial, Mr. Smith presented evidence supporting an alibi defense. He described his activities on Friday, September 23, 1994, the day Mr. Harris disappeared, which included cashing his paycheck, paying on his rings, paying on a drug test, seeing his probation officer, and helping his mother-in-law move. (Trial Tr. 1359:16-1368:2). He says he did not see Mr. Harris that day and had not seen him since at least the week before. (Id. at 1368:9-12).
 

 “41. Kevin Harville, testifying for the State at trial, said that he had seen Mr. Smith and Mr. Harris at Mr. Harris’s residence at the Overlook Motel. (Trial Tr. 1033:3-7). But Mr. Harville did not remember on what date he had seen Mr. Smith with Mr. Harris; he knew only that it was on a Friday in September 1994. (Id. at 1036:16-18; Hrg. Tr. 305:1-4).
 

 “42. Mr. Harville knew Mr. Harris because Mr. Harris and Mr. Harville’s wife were involved in an automobile accident in which Mr. Harville’s truck was totaled. (Trial Tr. 1030:25-1031:3; Hrg. Tr. 300:9-13). Following the accident, Mr. Harris and Mr. Harville entered into an agreement by which Mr. Harris agreed to pay Mr. Harville $50 every week until the value of the truck was repaid. (Trial Tr. 1031:10-16).
 

 “43. Mr. Harville knew that he had seen Mr. Smith with Mr. Harris on a Friday because he knew Mr. Harris received his paycheck on Fridays and so that was the day of the week Mr. Har-ville would always go to collect money for his truck. (Trial Tr. 1031:17-1032:1; Hrg. Tr. 301:3-10).
 

 “44. Neither Mr. Daniel, Mr. Spain nor anyone working on Mr. Smith’s behalf spoke to Mr. Harville prior to Mr.
 
 *1077
 
 Smith’s trial. (Hrg. Tr. 808:4-13). If they had tried to, Mr. Harville would have been willing to speak with them about the case (id. at 308:14-17) and he would have told them the following:
 

 “45. First, Mr. Harville would have said that on two successive Fridays after the day Mr. Harville saw Mr. Smith and Mr. Harris together at the Overlook Motel, Mr. Harville went to collect payments from Mr. Harris. (Hrg. Tr. 306:3-5). On both occasions, Mr. Harris did not answer his door and thus Mr. Harville could not collect his payment. (Id.)
 

 “46. Second, Mr. Harville would have said that a few days after his second failed attempt to collect payment from Mr. Harris, Mr. Harville learned that Mr. Harris was dead. (Hrg. Tr. 306:13-16). At about that same time, on October 5, 1994, Mr. Harville was questioned by police regarding Mr. Harris’s death. (Id. at 301:24-302:1).
 

 “47. Third, if shown a calendar, Mr. Harville could have confirmed that the two successive Fridays prior to October 5, 1994 were September 30, 1994 and September 23, 1994. (Hrg. Tr. 307: 11-25). The date that Mr. Harville saw Mr. Smith and Mr. Harris together was September 16, 1994, the Friday before his first failed attempt to collect payment from Mr. Harris. (Id. at 308:1-3). Mr. Harville did not see Mr. Smith or Mr. Harris on September 23,1994.
 

 “48. Although it was not his testimony, at Mr. Smith’s trial the prosecutor incorrectly asserted to the jury that Mr. Harville had seen Mr. Smith and Mr. Harris together at the Overlook Motel on September 23, 1994, the date on which Mr. Harris disappeared. (Trial Tr. 1471:19-21). Mr. Daniel did not object to the prosecutor’s incorrect assertion or make any attempt to clarify Mr. Harville’s testimony at trial. No other evidence at trial suggested that Mr. Smith was with Mr. Harris on September 23.”
 

 (C. 18-32.) The circuit court further found that counsel had not adequately investigated evidence pointing to a third party as the perpetrator:
 

 “57. In his testimony, Mr. Daniel expressed his desire to investigate Carl Cooper. For example, asked whether he conducted ‘an investigation into Carl Cooper’s criminal background,’ Mr. Daniel said T
 
 believe we
 
 tried.to look into it.’ (Hrg. Tr. 474:6-9) (emphasis added). He claimed that he
 
 ‘wanted
 
 [Walter Spain] to go out and find as much as he could about the relationship between Carl Cooper and Dennis Harris.’ (Id. at 409:2-4) (emphasis added). And he asserted that he
 
 ‘thinks we tried
 
 ’ but he could not say whether he or his investigator had been able to get in touch with Mr. Cooper’s ex-wife, Sarah Johnson. (Id. at 407:12-20) (emphasis added). As noted (FF 15), Ms. Johnson testified at the November 2006 hearing that she was never contacted by Mr. Daniel or anyone working for him.
 

 “58. Whatever Mr. Daniel’s hopes and despite his suspicions, the Court finds that he did not make a meaningful effort to investigate Carl Cooper’s — or any other third party’s — likely involvement in the Harris murder. No records from his files of any criminal background checks of Mr. Cooper were ever introduced. Mr. Spain’s billing records reflect no effort to investigate Mr. Cooper (Ex. 1), and Mr. Spain himself had no memory of trying to do so. (Hrg. Tr. 39:17-19) Further, as detailed below, Sarah Johnson and other witnesses with knowledge of evidence implicating Mr. Cooper and another potential suspect, Brian Fox, were available to talk to Mr.
 
 *1078
 
 Daniel in the summer of 1995 and would have been willing to do so, but they were never contacted.
 

 “59. Instead, it appears that Mr. Daniel intended to rely on Mr. Smith’s 16 year old wife to testify and to implicate Carl Cooper. Mr. Daniel provided no details about what knowledge he thought Tanya Smith had implicating Mr. Cooper. He simply professed ‘hope’ that ‘she would help me point the finger [at Mr. Cooper] because I still to this day don’t think Larry Smith committed that murder.’ (Hrg. Tr. 412:18-20). Mr. Daniel continued: ‘[Tanya Smith] was present when [Mr. Cooper] said certain things and I can’t remember right now what exactly they were.... But they would have been of an incriminating nature and would not have been hearsay.... It concerned Dennis Harris and, you know, basically going over and holding him up, I believe is what it was about.’ (Id. at 413:2-14). The jury never heard anything about this possible defense, however, because, according to Mr. Daniel, Tanya Smith refused to testify at the trial (id. at 414:18-19), and Mr. Daniel had not located any other witness who might testify to Mr. Cooper’s involvement in the Harris murder.”
 

 (C. 34-35.) The circuit court also set out its findings with regard to Cooper’s ex-wife. The circuit court found that Cooper’s ex-wife was a potential witness that Daniel was aware of at the time of trial; that she had given a statement to police investigators as part of the initial investigation into the murder; and that she had testified at the evidentiary hearing in the Rule 32 proceeding that she would have been willing to speak with the defense had they approached her. The circuit court further found that Cooper’s ex-wife had indicated that she would have informed the defense that she and Cooper were having financial troubles at the time of the murder and that Cooper had proposed the idea of robbing Harris but that Smith had been “dismissive of the idea because ‘he didn’t have to do anything [to] Dennis to receive money from him, because he was [a] good friend and he would help [Mr. Smith] out at any time.’ (Id. at 249:15-22). (The Court notes that this matches the description of the conversation Mr. Daniel says Tanya Smith had described to him.”) (C. 36-37.) The circuit court further found that Cooper’s ex-wife had testified at the evidentiary hearing that Cooper had purchased a handgun in July 1994; that Cooper had been “unusually interested in the newspaper coverage of the discovery of Dennis Harris’s body” (C. 37); that Cooper had called the sheriffs department and an investigator had come to their house to take a statement; and that, before the investigator arrived, Cooper had threatened to kill her parents and her if she “ever went against him.” (C. 37.) The circuit court also found that Cooper’s ex-wife had indicated that she and Cooper had sat together when giving their statements to the investigator and that she had merely substituted Smith’s name for Cooper’s when providing details to the investigator.
 

 “69. Eighth, Ms. Johnson [Cooper’s ex-wife] testified, credibly, in the Court’s view, that had she testified at trial, she would have corrected her earlier statement to the police by offering the following truthful information: (A) She never heard Mr. Smith suggest robbing Dennis Harris (id. at 263:15-264:3; 266:4-267:11); the only person she heard make that suggestion was Carl Cooper (id. at 261:20-21; 266:8-9). (B) She never saw Mr. Smith with a gun (id. at 264:6-18); rather, the gun and holster she had described in her statement belonged to Mr. Cooper. (C) She never heard Mr.
 
 *1079
 
 Smith say he stole a gun from Larry Moffett (id. at 265:22-266:1), rather, she was simply parroting what Mr. Cooper had said in his statement.
 

 “70. Ninth, Ms. Johnson would have said that on Friday, September 23, 1994, the day that Dennis Harris disappeared, Carl Cooper was gone from their apartment for much of the afternoon and evening. (Hrg. Tr. at 271:4-9). When he arrived home, Mr. Cooper was wet and muddy; his pants were torn at the knee and his sweatshirt was torn at the shoulder. (Id. at 273:10-17; 274:18-275:7). Mr. Cooper’s only explanation for his appearance was that he had been attacked by a pack of dogs. (Id. at 276:13-15). After returning home, he took off his torn and muddy clothes and put them in a bag, which he took out of their apartment. (Id. at 276:22-277:4).
 

 “71. Although Ms. Johnson felt threatened by Carl Cooper and had been afraid for her and her family’s lives when she gave what she says was an untruthful statement to police in October 1994, she testified that by the summer of 1995 she would have been willing to tell the truth to investigators and at trial. (Hrg. Tr. 279:10-20). That is because in February 1995, Ms. Johnson left Mr. Cooper after he had broken their one-month-old daughter’s arm. (Id. at 279:16-17). Ms. Johnson promptly filed charges against Mr. Cooper for child abuse and domestic abuse (id. at 295:9-18) and secured her divorce by April 1995. (Id. at 294:6-10). She had no other contact with Mr. Cooper after that point. (Id. at 278:12-13). The Court finds Ms. Johnson’s testimony concerning her availability and willingness to cooperate with the defense, had she been approached, to be credible.”
 

 (C. 38-39.)
 
 [5]
 

 The circuit court also made extensive findings regarding the lack of expert testimony, particularly relating to police investigative procedures during the questioning of Cooper and his ex-wife and the interrogations of Smith. One such expert testified at the evidentiary hearing on the Rule 32 petition; the circuit court found that that expert had been available and had been listed in the National Directory of Expert Witnesses at the time of trial.
 

 “Given these facts and his former position with the Birmingham police department, the Court is confident that Mr. Gaut [the expert witness] was known in the state to EJI and to experienced lawyers and law enforcement officials, and that he could have been located.
 

 “98. The Court finds that at the time of Mr. Smith’s trial, Mr. Gaut was available in order to provide information and testimony that would have allowed Mr. Daniel to undermine to the jury the credibility of Mr. Smith’s alleged confession. (Hrg. Tr. 113:1-12). His testimony would also have been valuable in showing that the original statement to the police by Carl Cooper’s former wife, Sarah Johnson, was taken in a highly flawed manner that led to it being deceptive. Had Mr. Daniel interviewed Ms. Johnson and had her testify at trial, this testimony from Mr. Gaut would have been extremely important.
 

 “99. Mr. Daniel was not an expert on police procedures (Hrg. Tr. 496:10-16),
 
 *1080
 
 and he did not retain experts on police procedures to assist in the defense of Mr. Smith. (Id. at 496:17-20). Although Mr. Daniel claimed he was ‘knowledgeable’ about police procedures (id. at 524:6-10), the trial record fails to show that Mr. Daniel challenged the State’s failure to preserve a recording or transcript of Mr. Smith’s first post-arrest interrogation. Mr. Daniel also failed to make any effort or offer any argument that this breach in police procedure, which Mr. Gaut testified was highly unusual (id. at 211:6-13), severely undermined the credibility of Mr. Smith’s alleged confession taken in the second post-arrest police interrogation.”
 

 (C. 49-50.) The circuit court further made extensive findings regarding the lack of any expert testimony being offered in the area of false confessions, noting that the EJI manuals Daniels testified he had referenced in preparing the defense identified available resources in the field, and that Daniels “seemed unfamiliar with this topic and the existence of possible expert witnesses in this area.” (C. 50.)
 
 [6]
 

 Similarly, with regard to the prejudice prong of
 
 Strickland,
 
 the circuit court made extensive findings as to how each of these acts or omissions by counsel adversely impacted the defense.
 

 To the extent that the circuit court found that Daniel had failed to conduct “any” investigation, such a finding is not accurate. Similarly, the circuit court found that Daniel made “no” effort to locate certain witnesses. Daniel’s testimony at the Rule 32 hearing indicates that he performed “some” investigation, and there is evidence suggesting that Daniel did attempt to locate some of the witnesses described. However, we construe the circuit court’s language as indicating that the circuit court found that Daniel had not conducted any
 
 meaningful
 
 or
 
 adequate
 
 investigation.
 
 [7]
 
 The evidence as to the amount and adequacy of that investigation was conflicting. On the one hand, Daniel testified that he had performed 200-300 hours
 
 *1081
 
 of personal investigation and that members of his staff had telephoned potential witnesses. On the other hand, in addition to eliciting testimony from Daniel that undermined the weight and credibility of Daniel’s testimony, Smith’s Rule 32 counsel presented a number of witnesses whose testimony suggested that the investigation was deficient and that Smith’s defense was prejudiced as a result. As stated above, it was the duty of the circuit court to resolve those conflicts; the circuit court weighed the evidence and determined the credibility of the witnesses, and it is clear that it found that Smith had not received the effective assistance of counsel at trial. Although some of the language in the circuit court’s order may not be technically accurate, the vast majority of its findings and its ultimate conclusion are supported by the record.
 

 B.
 

 With regard to trial counsel’s performance at the sentencing phase of Smith’s trial, the State argues that counsel made the strategic decision to present two witnesses at the sentencing phase, rather than calling all the witnesses who had testified at the guilt phase, because their testimony would be cumulative and would lose effectiveness with the jury. The State points to the following excerpt from Daniel’s testimony at the evidentiary hearing on the Rule 32 petition, at which Daniel, after being asked why he did not present additional details, stated:
 

 “[Daniel]: Okay. Anybody who has ever tried a number of jury trials where you basically have to go over there and you have to present an idea to a jury, there comes a point where you get — you get the point across to those 12 people. They’re not deaf.
 

 “[State]: Yes, sir.
 

 “[Daniel]: If you make your point, that’s all you want to do. If you get to the point to where you’re constantly running 20 witnesses in and they’re saying the same thing over and over again, you run the risk of basically over saturation and you run the great risk of alienating the jury against you.
 

 “[State]: Have you seen that happen before in other cases?
 

 “[Daniel]: Oh, yeah. I have seen several cases where lawyers on both sides didn’t have any stopping sense.
 

 “[State]: Yes, sir.
 

 “[Daniel]: And they wanted to bring in 20, 30 witnesses and basically the jury, I have had juries tell me after cases that, you know, we got the point.
 

 “[State]: Yes, sir.
 

 “[Daniel]: And it just irritated us because they kept beating the dead horse. You got to know when you make your point when to stop because the quickest way to lose a case is to alienate the jury against your position. And I had three witnesses who testified in that case to basically to what we needed to have testified. There was no reason to overkill cause it was a judgment call.”
 

 (R. 430-31.) Daniel’s decision, the State avers, is permissible under
 
 Strickland,
 
 and, it asserts, the circuit court’s reliance on the EJI guidelines as a basis for determining that Daniel’s decision amounted to ineffective assistance of counsel was in error.
 

 Although we agree that strategic decisions are within the purview of counsel and, as stated in part I of this opinion, that the
 
 Strickland
 
 standard is the proper standard to apply in determining whether trial counsel rendered ineffective assistance, the State’s argument is not well taken.
 

 
 *1082
 
 ‘“Once counsel conducts a reasonable investigation of law and facts in a particular case, his strategic decisions are “virtually unchallengeable.”
 
 [Strickland v. Washington,
 
 466 U.S. 668] at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 [ (1984) ]. Tactical or reasonable professional judgments are not deficient but a failure to investigate a material matter due to inattention may be deficient. When the claim is that counsel failed to present a sufficient mitigating case during sentencing, the inquiry “is not whether counsel should have presented a mitigation case” but “whether the investigation supporting counsel’s decision not to introduce mitigating evidence ... was itself reasonable.” See
 
 Wiggins [v. Smith],
 
 539 U.S. [510] at 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 [ (2003) ] (internal citations omitted).’ ”
 

 Davis v. State,
 
 44 So.3d 1118, 1141 (Ala. Crim.App.2009), quoting
 
 Powell v. Kelly,
 
 562 F.3d 656, 670 (4th Cir.2009).
 
 See also Ex parte Land,
 
 775 So.2d 847, 853-54 (Ala. 2000). “When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger.”
 
 Chandler v. United States,
 
 218 F.3d 1305, 1316 (11th Cir.2000).
 
 See also Provenzano v. Singletary,
 
 148 F.3d 1327, 1332 (11th Cir.1998) (“Our strong reluctance to second guess strategic decisions is even greater when those decisions are made by experienced criminal defense counsel.”).
 

 However, it is clear that labeling a decision as “strategic” does not render that decision above reproach; rather, counsel must have performed an adequate enough investigation to make an informed and educated decision. “[A] strategic decision that is based on an incomplete investigation may not be strategic or reasonable.”
 
 Harris v. State,
 
 947 So.2d 1079, 1119 (Ala. Crim.App.2004), S.Ct. quashed writ in part and aff'd. 947 So.2d 1139.
 
 See also Wiggins v. Smith,
 
 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).
 

 “In cases where sentencing counsel did not conduct enough investigation to formulate an accurate life profile of a defendant, we have held the representation beneath professionally competent standards. See, e.g.,
 
 Blanco [v. Singletary],
 
 943 F.2d [1477] 1501-03 [(11th Cir.1991) ] (counsel’s performance deficient where his sole attempt to procure mitigation witnesses for penalty phase was to leave messages for the witnesses and await their responses, and he thus ultimately conducted no interviews);
 
 Harris [v. Dugger],
 
 874 F.2d [756] 763 [ (11th Cir.1989) ] (counsel deficient where he did not investigate defendant’s family, scholastic, military and employment background);
 
 Middleton [v. Dugger],
 
 849 F.2d [491] 493 [(11th Cir. 1988) ] (performance deficient where ‘trial counsel conducted almost no background investigation, despite discussions with Middleton concerning the existence of such mitigating evidence’ as psychiatric problems, brutal childhood, physical, sexual and drug abuse, and low I.Q.);
 
 Armstrong [v. Dugger],
 
 833 F.2d [1430] 1433-34 [(11th Cir.1987)] (performance deficient where trial counsel’s investigation of mitigating evidence was limited to single conversation with defendant and his parents, and another conversation with defendant’s parole officer).”
 

 Jackson v. Herring,
 
 42 F.3d 1350, 1367 (11th Cir.1995).
 

 In its order addressing the sentencing phase, the circuit court found:
 

 “Mr. Daniel had never before tried a capital murder case (Hrg. Tr. 484:23-25), so his ‘judgment’ was not based on experience with such cases. And while he said he had read EJI’s recommenda
 
 *1083
 
 tions of how to handle the sentencing phase of a capital murder case, and claimed he tried to follow these recommendations (id. at 521:10-24), the evidence, described above (FF ¶¶ 113-115), suggests otherwise.”
 

 (C. 56.) Here, it is apparent that the circuit court’s findings are based heavily on the fact that Daniel was
 
 not
 
 experienced in defending capital-murder cases. Further, the circuit court found “that the modest case [Daniel] presented resulted from lack of preparation and investigation rather than an informed strategic choice.” (C. 87.) The circuit court’s findings are supported by the record, and nothing in the State’s brief warrants this Court’s going behind the circuit court’s resolution of credibility choices to reverse the circuit court’s judgment. Although Smith’s showing of prejudice as to this claim is not as strong as his showing that counsel’s performance was deficient in the investigation and the presentation of Smith’s defense at the guilt phase of Smith’s trial, we conclude that the circuit court correctly determined that “a reasonable probability exists that but for the ineffective assistance of Mr. Smith’s counsel, the outcome of Mr. Smith’s trial might well have been different.” (C. 90.)
 

 For these reasons, the circuit court’s judgment — granting Smith’s Rule 32 petition and ordering a new trial — is affirmed.
 

 AFFIRMED.
 

 WELCH, J„ concurs. WISE, P.J., and WINDOM and KELLUM, JJ., concur in the result.
 

 [1]
 

 . Although the limitations period in Rule 32.2(c), Ala.R.Crim.P., currently provides for a one-year period in which the petition must be filed, at the time Smith filed his petition the rule provided a two-year limitations period. Thus, Smith's Rule 32 petition was timely filed.
 

 [2]
 

 . The issue presented in
 
 Jones
 
 was whether trial counsel should be found per se ineffective for failing to comply with the ABA guidelines, which Alabama has not adopted.
 

 [3]
 

 . Nothing in this opinion should be construed as making any sort of "cumulative error"
 
 *1072
 
 finding with regard to Smith’s allegations that the cumulative effect of various instances of ineffective assistance of counsel amounted to prejudicial error.
 

 [4]
 

 . The evidence at the evidentiary hearing indicated that Smith's aunt, Ms. Burkett, hired Daniels approximately six months before the trial began and that the agreement called for the family to pay Daniels an initial fee of $25,000 plus $125 per hour once the $25,000 had been earned. The circuit court found that Daniels had also billed Smith's family for "paralegal expenses ($378 for 12.6 hours of time) and for investigative expenses ($209 for 5 hours of time and related expenses). (Ex. 11.) He also billed Smith’s family for copying costs ($187.76), for long-distance telephone charges ($59.45), and for other out-of-pocket expenses he says he incurred defending Smith. (Exs. 10 and 11; C. 17.)
 

 [5]
 

 "5The testimony Mr. Daniel refers to was given by Kevin Harville, not Ray Thomas. (Trial Tr. 1038:23-1039:3). His mistake, however, does not alter the point, which is that he is referring to his memories of trial testimony, and not interviews or other efforts from any pretrial investigation.”
 

 [5]
 

 . The circuit court also discussed in its order its findings with regard to another witness who testified at the Rule 32 hearing that she would have informed the defense that she had overheard Cooper and another man discussing framing Smith for a crime. The circuit court found this witness’s testimony to be equivocal, and it accepted that testimony only for the proposition that, had Daniel been aware of the information this witness testified to, he might have conducted additional investigation.
 

 [6]
 

 . Although the circuit court found that an expert who testified at the evidentiary hearing on the Rule 32 petition had testified in Alabama as early as 1999, and could have testified at Smith’s trial, we make no determination as to the propriety of the circuit court's finding that this particular witness was available at the time of Smith's trial. However, the general premise that defense counsel should have been aware of the need for such an expert in this case, and the resources available at the time, do support the circuit court’s findings that counsel did not adequately prepare with regard to this issue.
 

 [7]
 

 . The circuit court indicated that it found Daniel’s testimony regarding his efforts at the sentencing phase of Smith’s trial to be "unpersuasive” and that "Mr. Daniel’s [testimony] shows that he failed to conduct any meaningful investigation into evidence that could have been presented at the sentencing phase, and that the modest case he presented resulted from lack of preparation and investigation rather than an informed strategic choice.” (C. 87.) With regard to the pretrial investigation, the circuit, court stated:
 

 "The Court concludes that the adversarial process broke down in this case. Mr. Daniel made no meaningful effort at any pretrial investigation. There is no credible evidence that he personally undertook to locate or speak with any fact or expert witnesses who might have been helpful to Mr. Smith’s defense. There is some evidence that he modestly delegated investigative tasks to one other person, Walter Spain, but Mr. Spain did not have either the ability, time, resources or experience necessary to conduct a meaningful pretrial investigation into a case of this magnitude. The Court cannot conceive of a capital murder case that could be adequately investigated in three hours, excluding transit time, which is all the time Mr. Spain spent on this case. Certainly, there was much more to be discovered, as evidenced by Mr. Smith’s presentation at the November 2006 hearing.”
 

 (C. 88-89.)